MILLIS CONSTRUCTION COMPANY v. FAIRFIELD SAPPHIRE VALLEY, INC.

No. 8630SC1209

(Filed 4 August 1987)

**1. Contracts § 21.3— anticipatory breach of contract—instruction required**

The trial court erred in refusing to instruct the jury on anticipatory breach of contract by repudiation as requested by defendant where there was evidence that the parties entered contracts for plaintiff to perform framing work for five residential buildings; plaintiff told defendant's construction manager that he could not perform the remaining contracts unless he was paid the retainage for one building before he was entitled to it under the contract; and such statement was made at least one month before completion of three of the buildings was required under the terms of the contracts.

**2. Contracts § 21.2— breach of contract—materiality—amount of recovery**

The evidence in a breach of contract action presented jury questions as to whether defendant owner breached construction contracts with plaintiff by failing to pay plaintiff money owed for work performed by plaintiff as of the date defendant contends plaintiff anticipatorily breached the contracts and, if so, whether defendant's breach was material, thus entitling plaintiff to retainages on buildings which he failed to complete.

APPEAL by defendant from *Allen (C. Walter), Judge.* Judgment entered 8 May 1986 in Superior Court, JACKSON County. Heard in the Court of Appeals 8 April 1987.

This is a civil action for breach of contract. Defendant Fairfield Sapphire Valley, Inc. is the owner and developer of a large tract of land near Cashiers in Jackson County. Plaintiff Millis Construction Company (owned by Brent Millis) is an independent contractor. Beginning in June 1984 and at various times thereafter, plaintiff and defendant entered into five separate written "subcontracts" for the framing of five residential buildings on defendant's land. The five residential buildings were numbered by the contracts 6, 7, 8, 9 and 10 as part of the Fairway Forest project in Cashiers. This action involves no claim or dispute as to building number 6. The contract price for each building was $29,500.00 which included a $4,500.00 profit to plaintiff. Plaintiff agreed to provide all labor and tools to frame the buildings and defendant agreed to provide all the necessary materials. Finished carpentry work was not contemplated as part of the contracts by the parties.

Millis Construction Co. v. Fairfield Sapphire Valley

During the course of construction, plaintiff was paid weekly "draws" against the total contract prices. Each "draw" was based on the percentage of work completed as evidenced by plaintiff's invoices submitted to and approved by the site superintendent and defendant's construction manager, James Coker. Defendant's vice president for construction engineering, Carey Ayers, had sole final authority to approve payment. This process took approximately two weeks. No check was ever issued in payment of plaintiff's invoices without Carey Ayers' signature. Pursuant to the contracts, ten percent of each draw was retained by defendant with the total retainage due to plaintiff thirty days after satisfactory completion of each building.

According to plaintiff's evidence, while the buildings were still under construction in early September 1984, plaintiff expanded to do work in Nashville, Tennessee. Brent Millis left the job site but kept his office, office personnel and employees at the site. He introduced James Coker to his project manager Lee Myers and authorized Myers to sign on the contracts as a representative of Millis Construction Company. Plaintiff took no key workmen to Nashville. Millis returned weekly to Cashiers to check on the project. Defendant knew that Millis was no longer on the job site daily but knew of his whereabouts in Nashville.

James Coker testified that in October and November of 1984 he began to hear rumors that some of plaintiff's crew had quit and that Millis was not coming on the job weekly. He discussed the rumors with Lee Myers and learned that there was a problem with employees leaving the job, that there were not enough men to do the work, that work was behind schedule and of bad quality. According to Brent Millis, he knew of no problems at the Fairway Forest project until 14 November 1984 when Lee Myers called him in Nashville and told him that Coker would not pay the weekly "draw" until he talked with Millis in person. Millis immediately drove to Cashiers and met with Coker in Coker's office on Friday, 16 November 1984.

At the November 16 meeting Millis stated that he was "belly up" and "busted." He had not paid his employees all their wages four weeks earlier. He was concerned about how he would pay them for the next two weeks. He stated that he had no operating capital and he did not think there was enough money available to

complete the job. Millis stated that he had no money to pay labor but that if Coker would agree to release the retainage on building number 7 which was 99% complete he would have enough money to pay labor. Coker asked if Millis wanted out of the contract and the following exchange took place:

> MILLIS: I guess I don't have any choice once again. Everybody has quit me now. Lee said everybody just walked out. . . . I just as soon finish the buildings. I'm open for any suggestions.

> COKER: Well, I don't know. Can you get with these guys and see what you can do and then let's try to get together Monday and work something out?

> MILLIS: Okay.

> COKER: On what we intend to do and what you intend to do. Why don't we do that and Monday we'll get together first thing and get it worked out.

> MILLIS: Okay. Is there any chance that I can get that retainage to meet payroll.

> COKER: Well, that's something I'm going to have to find out.

Brent Millis testified that it was his impression that all of the problems were worked out on Friday. He was not able to be in Cashiers on Monday but told Lee Myers to pick up the check. Some of plaintiff's workers were at the job on Monday, others were at home waiting to be called in once Myers received the check. Lee Myers testified that he tried to meet with Coker on Monday morning to get the check but Coker was not around. Coker testified that he was available on Monday but that Millis never showed up. He tried to contact Millis by telephone but never reached him. The record is not clear about whether any check was available from defendant to plaintiff on that Monday. It is also unclear what amount of money was owed for work completed and approved and whether defendant had decided to release the retainage on building number 7.

Coker met with his superior Carey Ayers on Monday to tell him that Millis had not met with him. As a result of his meeting with Coker, Carey Ayers sent the following letter to Millis on 19 November 1984:

Millis Construction Co. v. Fairfield Sapphire Valley

Reference: Fairway Forest
buildings 7, 8, 9 and 10

Dear Mr. Millis:

The work progress on the above referenced buildings is unacceptable. Unless substantial work is begun immediately, we will be forced to terminate our contract on the above buildings. As provided in our contract on the above buildings this is your 48-hour notice of contract termination.

Ayers talked with Millis later in the week. According to Ayers, he could not get a commitment from Millis as to whether Millis would complete the contracts, whether he had enough capital to pay his workers and even if he desired to complete the buildings. Mr. Ayers' opinion was that Millis would not complete and Ayers then contracted with others to have the buildings completed. Mr. Ayers testified that defendant is owed $23,825.43 due to plaintiff's failure to complete the contracts.

Plaintiff filed its complaint for breach of contract alleging damages in excess of $10,000.00. Defendant answered denying the material allegations of plaintiff's complaint and counterclaimed for breach of contract and damages in excess of $10,000.00. The jury returned a verdict in favor of plaintiff in the amount of $25,000.00 and the defendant appeals.

Smith, Bonfoey & Queen by Frank G. Queen for plaintiff-appellee.

Coward, Cabler, Sossomon & Hicks by J. K. Coward, Jr. for defendant-appellant.

EAGLES, Judge.

[1] Defendant assigns error to the trial judge's refusal to charge the jury on the issue of anticipatory breach as requested by the defendant pursuant to G.S. 1A-1, Rule 51(b).

It is the duty of the trial judge without any special requests to instruct the jury on the law as it applies to the substantive features of the case arising on the evidence. Faeber v. E.C.T. Corp., 16 N.C. App. 429, 192 S.E. 2d 1 (1972). When a party ap-

---

---

propriately tenders a written request for a special instruction which is correct in itself and supported by the evidence, the failure of the trial judge to give the instruction, at least in substance, constitutes reversible error. *Bass v. Hocutt*, 221 N.C. 218, 19 S.E. 2d 871 (1942); *Faeber v. E.C.T. Corp., supra.* Here, we believe the trial court improperly refused to give the requested instruction on anticipatory breach.

The trial court submitted two issues to the jury on breach of contract: Did the defendant breach its contract with the plaintiff and did the plaintiff breach its contract with the defendant? Breach of contract occurs when a party fails to perform a contractual duty which has become absolute. J. Calamari and J. Perillo, The Law of Contracts section 12-1, at 513 (3d ed. 1987). As explained by the Restatement when performance of a duty under contract is presently due any nonperformance constitutes a breach. Restatement (Second) of Contracts section 235(2) (1981). Breach may also occur by repudiation. *Id.* at section 236 comment a. Repudiation is a positive statement by one party to the other party indicating that he will not or cannot substantially perform his contractual duties. Calamari and Perillo, section 12-4, at 524; Restatement (Second) of Contracts at section 250 comment a. When a party repudiates his obligations under the contract *before* the time for performance under the terms of the contract, the issue of anticipatory breach or breach by anticipatory repudiation arises. Calamari and Perillo, section 12-3, at 521. One effect of the anticipatory breach is to discharge the non-repudiating party from his remaining duties to render performance under the contract. Restatement (Second) of Contracts at section 253(2).

> [W]hen a party to a contract gives notice that he will not honor the contract, the other party to the contract is no longer required to make a tender or otherwise to perform under the contract because of the anticipatory breach of the first party.

*Dixon v. Kinser and Kinser v. Dixon*, 54 N.C. App. 94, 101, 282 S.E. 2d 529, 534 (1981), *disc. rev. denied*, 304 N.C. 725, 288 S.E. 2d 805 (1982).

Here there was sufficient evidence to support an instruction that the plaintiff's statements during the November 16 meeting constituted a repudiation. In order to constitute a repudiation, a

party's statement "must be sufficiently positive to be reasonably interpreted that a party will not or cannot substantially perform." Calamari and Perillo, section 12-4, at 525 (quoting Restatement (Second) of Contracts at section 250 comment b). For example, if a party to a contract states "I doubt I will perform," his statement, alone, is not sufficiently positive to be reasonably interpreted by the other party to mean that he will not perform. *Id.* at 524. However, if a party to the contract states that he cannot perform except on some condition which goes outside the terms of his contract then the statement will constitute a repudiation. *Id.* at 525. Applying these rules to the facts here, we hold that plaintiff's statements on November 16 could have constituted a repudiation. According to defendant's evidence, at the meeting between Coker and Millis, Millis stated that he was "busted," "belly-up" and would be unable to complete the contract unless he received retainage on building number 7. However, according to the terms of the contract, plaintiff was not entitled to retainage until 30 days after building number 7 was completed. At the time of the November 16 meeting building number 7 was not yet completed. Clearly at the time of the November 16 meeting, plaintiff was not yet entitled to any retainage under the terms of the contract. In essence, his statement was that he could not perform the remaining contracts except on some condition outside the terms of the contracts, i.e. that he be paid the retainage before he was entitled to it under the contract.

If the repudiation occurs before the time of performance arises under the contract, the repudiation is anticipatory and the issue of anticipatory breach arises. Here plaintiff's statements were made on November 16, at least one month before completion of buildings 8, 9 and 10 was required under the terms of plaintiff's contracts. The effect of breach by anticipatory repudiation is to relieve the non-repudiating party from further performance under the contract. *Dixon v. Kinser, supra.* We agree with defendant's argument that had the jury been given the opportunity to consider the issue of anticipatory breach, it could have found that the defendant did not breach its contract with plaintiff but was no longer required to perform under the contract due to plaintiff's anticipatory breach or breach by anticipatory repudiation. *Dixon v. Kinser, supra.* Accordingly, the trial court erred in refusing to

instruct the jury on the issue of anticipatory breach as requested by defendant.

[2]   The issue of anticipatory breach does not affect defendant's obligation under its contracts to pay for work performed, invoiced and approved as of the date of the November 16 meeting, where defendant alleges plaintiff anticipatorily breached its contracts with defendant. Up until that date plaintiff had fully performed. The evidence suggests that plaintiff was owed money for work performed, invoiced and approved by defendant as of 16 November 1984 and that defendant without justification refused to pay for that work. Plaintiff's exhibit number four sets out the following amounts as being owed for invoices not paid: $3,064.50 for building number 8; $5,172.75 for building number 9; and $2,034.00 for building number 10. In addition, plaintiff's exhibit number four indicates that plaintiff was overpaid in the amount of $1,675.95 for work completed, invoiced and approved on building number 7. Plaintiff also claims retainage on buildings 8, 9 and 10 in the amounts of $1,276.89, $2,548.98 and $1,588.00 respectively. However, plaintiff never satisfactorily completed buildings 8, 9 and 10 and consequently would only be entitled to retainage on these buildings if it is found by the trier of the fact that defendant materially breached its contract with plaintiff. The general rule governing bilateral contracts requires that if either party commits a material breach of the contract, the other party should be excused from the obligation to further perform. *Coleman v. Shirlen*, 53 N.C. App. 573, 281 S.E. 2d 431 (1981). The question of whether a breach is material or immaterial is ordinarily a question of fact. *Id.* If the breach is material, the aggrieved party may cancel the contract and sue for total breach if he can show that he was ready, willing and able to perform but for the breach. *See* Calamari and Perillo, section 11-18, at 458. As a result, he may recover all of his damages under the contract. *Id.* If the breach is immaterial the aggrieved party may not cancel the contract but may sue for partial breach. When a party sues for partial breach, the contract continues and the aggrieved party may only recover those damages actually caused by the breach. *Id.* at 458-59.

In summary, we conclude that the evidence of record raises several questions. Did the defendant breach its contracts with plaintiff by failing to pay plaintiff money owed as of 16 November 1984 for work performed by plaintiff? If so, was the breach ma-

terial, thereby entitling plaintiff to recover for all damages under his contracts with defendant, or was the breach immaterial, thereby entitling plaintiff only to recover those damages actually caused by the breach? If the defendant did not materially breach its contract with plaintiff, then did plaintiff anticipatorily breach its contract with defendant by statements made by Millis at the 16 November 1984 meeting thereby excusing defendant from further performance under its contracts with plaintiff? If so, then defendant was justified in mitigating its damages by securing other contractors when it became obvious that plaintiff would not perform.

We note from the verdict in this case that the jury found that the defendant breached its contract with plaintiff. However, on this record it is not clear whether the jury in answering this issue relied on evidence that defendant failed to pay money due to plaintiff on 16 November or on evidence that defendant on 19 November sent the letter giving plaintiff its 48-hour notice of termination. Here the issues of breach and anticipatory breach are so intertwined that we cannot say, even given the jury's verdict, that the trial court's error in refusing to instruct the jury on anticipatory breach was harmless. Consequently, there must be a new trial.

New trial.

Chief Judge HEDRICK and Judge PARKER concur.