Sports Quest, Inc. v. Dale Earnhardt, Inc., 2004 NCBC 3

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | | IN THE GENERAL COURT OF JUSTICE |
| | | SUPERIOR COURT DIVISION |
| COUNTY OF IREDELL | | 02 CVS 0140 |

| | | |
|---|---|---|
| SPORTS QUEST, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DALE EARNHARDT, INC., a North Carolina corporation | ) | |
| | ) | |
| Defendants. | ) | 02 CVS 0140 |
| | ) | (Consolidated) |
| | | |
| ACTION PERFORMANCE COMPANIES, INC. | | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPORTS QUEST, INC. | ) | |
| | ) | |
| Defendant and Third-Party Plaintiff, | ) | 01 CVS 2200 |
| | ) | |
| v. | ) | |
| | ) | |
| FRED WAGENHALS | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | |

## ORDER AND OPINION

{1}    This case arises out of Plaintiff Sports Quest's claim that defendants effectively destroyed plaintiff's business as a licensee and marketer of NASCAR related merchandise.  Sports Quest asserts claims against Defendant Dale Earnhardt, Inc. ("DEI") for breach of contract, fraud, tortious interference with both business relations and prospective economic advantage, unfair and deceptive trade practices and civil conspiracy.

{2}    In a related and now consolidated case, Plaintiff Action Performance ("Action") asserts that it produced and sold $90,310.46 in replica racecars to Defendant Sports Quest, but never received payment for these goods. Action asserts claims against Sports Quest for breach of contract, statement of account and quantum meruit. Sports Quest counterclaims that Action and its CEO, Fred Wagenhals ("Wagenhals"), committed fraud, unfair and deceptive trade practices, tortious interference with contract and slander.

{3}   Sports Quest seeks monetary damages from DEI, Action and Wagenhals.  Action seeks to recover the allegedly past due payments for merchandise plus interest and the costs of bringing the action.

*Thomas, Godley & Childers, P.A. by Mark L. Childers for Plaintiff, Defendant and Third Party Plaintiff Sports Quest.*

*Alston & Bird, L.L.P by Bruce J. Rose, Judson Graves, and J. Mark Wilson for Defendant Dale Earnhardt, Inc.*

*Gray, Layton, Kersh, Solomon, Sigmon, Furr & Smith, P.A. by William E. Moore, Jr.; Arcangela M. Mazzariello for Plaintiff Action Performance Companies, Inc. and Third Party Defendant Fred Wagenhals.*

## I.

## FACTUAL BACKGROUND
### A.

### THE SPORTS QUEST AND DEI DISPUTE

{4}     Sports Quest is a North Carolina corporation, with its principal office and place of business in Iredell County, North Carolina.  Sports Quest enters into licensing agreements with NASCAR racing teams to obtain the rights to market merchandise that bears the intellectual property of these organizations, including various trademarked and copyrighted items.  Kenneth Frady ("Frady") is the founder and sole owner of Sports Quest.

{5}     DEI is also a North Carolina corporation with its principal office and place of business in Iredell County, North Carolina.  DEI is a privately held company that amongst other operations exclusively controls the images and likenesses of the late Dale Earnhardt and Dale Earnhardt, Jr. and the automobiles used by their racing teams.  DEI licenses the rights for outside companies to produce, distribute and market products bearing their likenesses and other intellectual property owned by DEI.

{6}     Action is a publicly traded Arizona corporation registered to do business in the State of North Carolina.  Action designs, promotes, markets, and distributes licensed NASCAR related products.  Wagenhals is both a citizen and resident of the State of Arizona, and is the president and chief executive officer (CEO) as well as a major shareholder of Action.

{7}     Beginning in 1998, Sports Quest entered into several licensing agreements with DEI (the "1998 licensing agreements") to produce and market merchandise that bore images and depictions related to both Earnhardts and their respective racing teams.  Subsequent documents executed by both parties extended Sports Quest's licensing rights to the elder Earnhardt until the end of 2002 and to the younger Earnhardt until the end of 2005.  Sports Quest paid royalties based on the sale of licensed products to DEI as compensation for the licensing rights.  The president of Sports Quest, Kenneth Frady, a veteran of NASCAR merchandising, had developed a relationship with the Earnhardt family before executing the 1998 licensing agreements.

{8}     DEI asserts that Sports Quest breached several provisions of the 1998 licensing agreements.  First, DEI asserts that Sport Quest violated the agreements' prohibition on sublicensing to third party vendors.  Second, DEI alleges that Sports Quest failed to tender royalties due in accordance with the licensing agreements.  Sports Quest does not dispute either violation of the 1998 licensing agreements.  Frady, however, claims that Sports Quest waived the prohibition against sublicensing because DEI knew about it and did not object.

{9}     The critical juncture in this case occurred on June 15, 2000, when Frady met at the DEI offices with the elder Earnhardt and the recently hired vice president of licensing for DEI, Joe Hedrick.  Frady and the elder Earnhardt signed a letter (the "June 15th letter") that allegedly altered the terms of the prior licensing agreements between DEI and Sports Quest.  The parties are in dispute over the particular circumstances, inducements and motivations surrounding the meeting and resultant document.

{10}          The June 15th letter had several key provisions at issue in this case.  First, Frady admitted that Sports Quest violated the prohibition on sublicensing contained in the 1998 agreements.  Second, DEI required Sports Quest to send a letter to third parties stating that it had sublicensed the rights to DEI properties to third parties.  The letters were to notify third parties that Sports Quest was no longer an agent of DEI, sublicensing

agreements would be honored by DEI, renewals would be negotiated with DEI, and all royalty payments should be mailed directly to DEI. Third, the letter stated that a new licensing agreement between DEI and Sports Quest would follow that would supersede the 1998 agreements and also provided the terms to be included in that subsequent document. The parties never entered into a subsequent agreement that incorporated the terms provided for in the June 15th letter.

{11}    Sports Quest complied with the terms of the letter and notified sublicensees that DEI would assume control over agreements concerning properties of DEI. The licensing relationship between DEI and Sports Quest following June 15, 2000 operated without any major difficulty until early 2001. On February 18, 2001, Dale Earnhardt, Sr. was killed in an accident during a NASCAR race.

{12}    In March 2001, Sports Quest stopped paying royalties without explanation. Sports Quest did not pay the royalties even after DEI notified Sports Quest in writing that it had breached the 1998 agreements. On November 13, 2001, DEI officially terminated the relationship with Sports Quest based on violations of the 1998 licensing agreements including nonpayment and sublicensing.

{13}    The parties have opposite views as to the purpose of the June 15th letter. DEI asserts that the agreement was an attempt on its part to cure Sports Quest's breach of the prohibition on sublicensing provided for in the 1998 agreements. Sports Quest contends that DEI used the June 15th letter to induce Sports Quest to sever ties with existing customers by assuming control of these relationships. Frady claims that DEI deceived him into signing the letter by incorrectly telling him that Sports Quest was in breach of the 1998 agreements and falsely promising a secure future relationship between DEI and Sports Quest. Frady also contends that the promises made by DEI in the June 15th meeting induced him to terminate profitable relationships with customers. A factual dispute clearly exists as to the events surrounding the June 15th letter.

{14}    The dispute also turns on factual issues regarding the collapse of Sports Quest's financial health. Sports Quest maintains that DEI and Action conspired to deceive it and exercise economic duress to force Sports Quest out of business. On the other hand, DEI claims Mr. Frady's recreational habits and lack of work ethic destroyed both his relationship with the Earnhardts as well as his business.

B.

THE ACTION AND DEI DISPUTE

{15}    The relationship between Action and Sports Quest dates back to 1997. Action provided die-cast replicas of racecars to Sports Quest for resale to the Hamilton Collection ("Hamilton"). Sports Quest was simply a middleman. It had no contract; it simply submitted purchase orders when it received orders from Hamilton. Hamilton had no contractual obligation to deal with Sports Quest. In late 2000 and early 2001, Dale Earnhardt, Sr. advised Action to sell its products directly to suppliers without using Sports Quest. In March 2001, Wagenhals informed Hamilton that it would sell replica racecars directly to Hamilton. The decision to sell directly to Hamilton eliminated Sports Quest's role in the distribution of the replica cars. Action also would no longer accept purchase orders from Sports Quest to provide products to Hamilton.

{16}    At the time of the decision to eliminate Sports Quest as an intermediary, Sport Quest owed over $90,000 to Action for previously shipped die-cast cars.[1] At the behest of Action, Hamilton cancelled seven outstanding purchase orders with Sports Quest. Hamilton later settled a dispute over the purchase order with Sports Quest by filling the cancelled purchase orders.

{17}    Sports Quest alleges that Action terminated the relationship only at the behest of DEI. Encouragement to eliminate Sports Quest provides the impetus for the claims against Action and asserts that together DEI and Action destroyed Sports Quest's relationship with Hamilton. Sports Quest claims that Action committed civil conspiracy, unfair trade practices and tortious interference by selling replica cars directly to Hamilton without going through Sports Quest.

## II.

## MOTION TO DISMISS

### A.

{18}     When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint are sufficient to state a claim upon which relief may be granted." *Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987).  In ruling on a motion to dismiss, the court must treat the allegations in the complaint as true.  *See Hyde v. Abbott Laboratories, Inc.*, 123 N.C. App. 572, 473 S.E.2d 680, 682 (1996).  The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.  *See id.*

### B.

{19}     DEI and Action assert that the Court should dismiss all of Sports Quest's claims because Frady has invoked his Fifth Amendment privilege against self-incrimination.  Frady refused to answer questions in depositions regarding his alleged drug use, nonexistent work ethic, and extramarital affair and a lawsuit brought against him for alienation of affection, criminal conversation and intentional infliction of emotional distress.  DEI and Action both argue that Frady's refusal to answer these questions prejudices the defense of the claims against defendants.

{20}     Action also asserts that Sports Quest failed to state claims against Action or Wagenhals upon which relief can be granted.  The Court, however, first addresses the argument that Frady's invocation of his Fifth Amendment privilege provides a basis for this Court to dismiss the entire case.

### C.

{21}     DEI alleges that the proximate cause of Sports Quest's collapse was Frady's behavior.  DEI claims that Frady used illicit drugs including cocaine, had an extramarital affair with a female employee and lacked any work ethic as evidenced by his propensity to sleep and fish during the day.  The importance of Frady's conduct is that DEI alleges that Frady himself caused Sports Quest to fail rather than any action by DEI.  The basis for the allegations of this destructive behavior is the testimony of two former Sports Quest employees, Jeffrey Finkbiner and Ashley Wolfe.

{22}     Frady refused to answer questions in depositions regarding the allegation of his illicit behaviors that DEI contends caused the downfall of Sports Quest.  He invoked his Fifth Amendment privilege against self-incrimination in response to questions about his alleged illicit conduct.  Frady, moreover, claims that testimony Finkbiner made about his destructive behaviors was false.  DEI in turn argues that Frady's invocation of the Fifth Amendment in response to relevant questions mandates the dismissal of his claims against DEI.

{23}     DEI cites to North Carolina case law to support the proposition that a party cannot seek affirmative relief and then invoke the privilege against self-incrimination in response to relevant questions.[2]  *See McKillop v. Onslow County*, 139 N.C. App. 53, 532 S.E.2d 594 (2001); *Querneh v. Colie*, 122 N.C. App. 553, 471 S.E.2d 433 (1996); *Cantwell v. Cantwell*, 109 N.C. App. 395, 427 S.E.2d 129 (1993).  The cases that DEI relies on to support the full dismissal of Frady's claims are not factually analogous to the case at hand.  Each case cited by DEI involves circumstances that prevent the broad application of their holdings to factually dissimilar cases and is easily distinguished from this matter.

{24}     In *McKillop*, the plaintiff challenged a lower court ruling that found her in contempt for violating a permanent injunction that enforced a county ordinance and prevented her from opening an adult-oriented business. 139 N.C. App. at 55, 532 S.E.2d at 596.  Plaintiff then refused to answer questions about whether she violated the injunction by exposing her breasts for a fee.  The questions that the plaintiff refused to answer

concerned the sole issue in the civil contempt action against her, which was operating an adult business in clear defiance of a court ordered injunction prohibiting such activity. *McKillop*, 139 N.C. App. at 63-65, 532 S.E.2d at 600-602.

{25}     In contrast, the questions that Frady refuses to answer are indeed relevant to the case at hand, but are not so essential to the case that the action must be dismissed because of his refusal to answer. Frady brings multiple claims, including breach of contract and fraud, that could be resolved without his having to waive his privilege against self-incrimination. In *McKillop*, the only factual and legal issues revolved around whether the plaintiff committed lewd acts for money in violation of the injunction. The plaintiff in *McKillop* could not claim that she was not in contempt and then refuse to answer questions about the very act that court held her in contempt for committing. On the other hand, Frady brings numerous claims that could be resolved regardless of his refusal to answer questions about his personal behavior. DEI's reliance on *McKillop* to dismiss this entire action because Frady invoked his privilege against self-incrimination regarding his alleged illicit behavior is misplaced, as his behavior is not the sole issue in the case at hand.

{26}     In the child custody case of *Querneh*, the plaintiff invoked his privilege against self-incrimination in response to questions about his illegal drug activity. 122 N.C. App. at 557, 471 S.E.2d at 435. The Court of Appeals dismissed the plaintiff's claim for custody, reasoning "issues such as custody should only be decided after careful consideration of all pertinent evidence *to ensure the best interests of the child are protected* ." *Id.* at 559, 471 S.E.2d at 436 (emphasis added). Clearly, the main concern of the *Querneh* court was that allowing the plaintiff not to answer questions about alleged drug activity created the risk of exposing the child to that potentially dangerous behavior.

{27}     The case at hand is a business dispute, and the best interests of a child are not at stake. The refusal of Mr. Frady to confirm or deny illicit drug abuse may have bearing on the failure of Sports Quest. Frady's alleged drug abuse, however, is not the focus of this case, nor is the outcome as serious as placing a child in the custody of an unfit parent. The *Querneh* court reasoning does not apply here because the policy concern in that case was protecting children from potentially harmful situations that may arise when an adult invokes the Fifth Amendment in response to questions about his or her parental fitness. The Court finds *Querneh* factually distinguishable from this matter. The rationale for dismissing the plaintiff's claim in that case for invoking his privilege against self-incrimination only justifies a narrow application of the holding to child custody disputes.

{28}     DEI also cites to the alimony dispute of *Cantwell* to support the full dismissal of Frady's claims. 109 N.C. App. at 396, 427 S.E.2d at 130. In *Cantwell*, the wife asserted her Fifth Amendment privilege against self-incrimination when asked about matters related to her adulterous activities. *Id.* The wife in *Cantwell*, however, based her claim for alimony on the premise that she was a dutiful and faithful wife to her husband who abandoned her without provocation. 109 N.C. App. at 396, 427 S.E.2d at 129. The husband in turn raised the affirmative defense that his wife committed adulterous acts. 109 N.C. App. at 396, 427 S.E.2d at 130. The *Cantwell* court found that the wife could not invoke the privilege and continue to maintain her action for alimony as well. *Id.* at 398, 427 S.E.2d at131.

{29}     In contrast to *Cantwell*, the behaviors that DEI questioned Frady about would not constitute an affirmative defense to any of the claims against DEI. For example, Frady's alleged drug abuse would not necessarily mean that DEI could not have possibly breached a contract with Sports Quest. An affirmative answer to questions regarding illicit behavior by Frady will not automatically absolve DEI factually or legally in this case. The answers may have some bearing on the outcome, but the jury can make inferences about Frady's refusal to answer these questions. On the other hand, the adultery allegations that the wife in *Cantwell* would neither confirm nor deny were potentially dispositive of her alimony cause of action. The Court cannot broadly construe *Cantwell* to dismiss all claims against DEI, as Frady invoked his privilege against self-incrimination in response to questions that, regardless of the answer, would not provide an affirmative defense.

{30} Case law does not support the complete dismissal of this action as requested by DEI and Action. The Court, however, will not permit Frady to refuse to answer questions about his behaviors and then attack the validity of the answers of other witnesses about the same subject matter. A party cannot stifle discovery by invoking the Fifth Amendment on a topic during a deposition and then testify or offer evidence at the trial on the same subject matter. To allow a party to do so would be unfair and frustrate the purpose of the discovery phase of litigation. The privilege is a shield, not a sword to be used in civil cases.

{31} This Court addressed a similar situation in another case. *See Staton v. Brame*, Order (No. 96 CVS 1409, Forsyth County Super. Ct.)(Tennille, J.). In that case, a party claimed his Fifth Amendment privilege during discovery and refused to provide any testimony at depositions. This Court reasoned that it would be unfair for a party to avoid discovery and then to testify at trial. The other party could not then prepare adequately for trial without knowing the content of the opposing party's testimony because of the invocation of privilege. The result proves unfair to the party that had its discovery efforts frustrated by the opposing party's refusal to answer questions. The privilege against self-incrimination is a personal liberty, but not a litigation tactic.

{32} In the case at hand, the Court cannot force Frady to abandon his Fifth Amendment privilege against self-incrimination regarding questions about his personal behavior. The Court, however, also cannot allow him to evade these questions during discovery and then present evidence about these matters at trial. Frady, moreover, cannot testify about the credibility of another witness' testimony concerning the same subject matter in which he invokes his Fifth Amendment privilege in response to questions during depositions. If Frady continues to invoke the Fifth Amendment in response to these questions during discovery then he cannot testify about the same matters at trial.

E.

{33} Frady's invocation of the Fifth Amendment in response to questions about his personal behavior does not preclude the consequence that a jury may draw adverse inferences. "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where privilege is claimed by a *party to civil cause*.' " *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1975)(quoting 8 J. WIGMORE, EVIDENCE 439 (McNaughton rev. 1961). In criminal cases, neither courts nor prosecutors may suggest that a defendant's silence is substantive evidence of guilt. *Id*. at 319. The policy rationale behind that distinction is that criminal cases involve personal freedom as opposed to the monetary and injunctive remedies at issue in a civil action. In a criminal case, the higher stakes of personal freedom require courts to limit more strictly what a jury may infer from a defendant's silence.

{34} This matter is a civil case, and Frady cannot invoke the Fifth Amendment without facing the possibility that a jury will conclude that he did in fact abuse drugs, commit adultery and sleep through the workday. The relief sought in this case is only monetary. The Court does not completely discount the importance of financial remuneration, but the relief sought will not deprive Frady of his freedom as might occur in a criminal case. Frady's invocation of the Fifth Amendment privilege is hardly grounds for dismissal, but neither does that same invocation allow him to frustrate the opposition's discovery. In a civil case, the law clearly allows the court to instruct the jury that it may infer that Frady's invocation may indicate that he behaved in the manner alleged.

**III.**

A.

{35} Action and Wagenhals also filed a motion to dismiss that addressed the substantive legal issues in addition to the Fifth Amendment controversy. These parties seek to dismiss the breach of contract, tortious interference, civil conspiracy and unfair trade practice claims asserted by Sports Quest. In addition, Wagenhals

requests that the Court completely dismiss him as a defendant in the action.

B.

{36}    Action and Wagenhals assert that Sports Quest did not sufficiently state allegations to sustain a breach of contract claim. They contend that no contractual obligation existed between Action and Sports Quest to enable a breach to occur. The only evidence of a contract between Action and Sports Quest are purchase orders that Action did not accept, sign or acknowledge.

{37}    The mere acknowledgement or receipt of a purchase order does not constitute assenting to the terms of an offer and thus does not create a contractual obligation. *See Southern Spindle & Flyer Co., v. Milliken & Co.,* 53 N.C. App. 785, 788, 281 S.E.2d 734, 736 (1981). In *Southern Spindle*, the defendant orally contracted with the plaintiff provider for the servicing of the defendant's machines. *Id.* at 735-36, 281 S.E.2d at 786-88. The plaintiff had performed a substantial portion of the services when the defendant sent a purchase order specifying numerous terms, including a provision to compel arbitration in the event of a dispute. Plaintiff acknowledged receipt but did not indicate a promise to comply with the terms proscribed in the purchase order. *Id.*, 53 N.C. App. at 788, 281 S.E.2d at 738. Defendant cancelled the remainder of the oral contract and plaintiff brought an action to recover the money owed under the agreement. The defendant filed a motion to dismiss because the purchase order included an arbitration clause. The *Southern Spindle* court denied the motion to dismiss and held that the acknowledgement of a purchase order did not mean that a party assents to the terms provided. *Id.*

{38}    In the case at hand, Sports Quest does not allege that Action even acknowledged the purchase order. The *Southern Spindle* court did not find that a contractual obligation existed in that situation even when the defendant acknowledged the purchase order. This Court, therefore, cannot find that the purchase orders that Action did not even acknowledge created a contractual obligation to Sports Quest because an acknowledged purchase order does not amount to a contract.

{39}    Action also maintains that Sports Quest failed to render payment for the goods and that the failure to do so negates the breach of contract claim. Sports Quest submitted purchase orders to and received replica cars from Action that it in turn distributed to Hamilton. Sports Quest admits to not remitting over $90,000 due to Action for the replica cars. Sports Quest failed to pay this money to Action despite the fact that Hamilton paid Sports Quest for the replica cars. When Action terminated the relationship, Sports Quest was in arrears for the products that it received.

{40}    The breach of contract claim against Action fails even if the Court determined that the purchase orders constitute a contract between Sports Quest and Action. Breach of contract occurs when a party fails to perform a contractual duty. *See Sechrest v. Furniture Co.*, 264 N.C. 216, 217, 141 S.E. 2d 292, 294 (1965); *Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.,* 86 N.C. App. 506, 510, 358 S.E.2d 566, 569 (1987). If a contract existed between Action and Sports Quest, then the failure to pay for the cars amounts to a breach by Sports Quest. Action shipped the cars to Sports Quest, who in turn distributed the goods to Hamilton and received payment.

{41}    In bilateral contracts, if a party to the contract commits a material breach of the contract, the other party is excused from the obligation to further perform under the contract. *See Lake Mary Ltd. P'shp. v. Johnston*, 145 N.C. App. 525, 537, 551 S.E.2d 546, 555 (2001); *Coleman v. Shirlen*, 53 N.C. App. 573, 578, 281 S.E.2d 431, 434 (1981). The failure to remit payment justifies Action's termination of its business relationship with Sports Quest. Action was not required to continue a relationship with a party that refused to tender payment due for the replica cars that it provided. If the argument that an unacknowledged purchase order constitutes a contract had merit, then Sports Quest's nonpayment excused Action from any breach of contract that it allegedly committed.

{42}    Sports Quest's allegation provides two grounds for the Court to dismiss the breach of contract claim against Action. First, North Carolina law does not find that an unacknowledged purchase order constitutes a contract. The absence of a contract with Sports Quest made it impossible for a breach by Action to occur.

Second, even if this Court found that the purchase order created a contract, Sports Quest's nonpayment was a breach and excused nonperformance by Action. Therefore, the Court dismisses the breach of contract claims against Action.

## C.

{43} Action seeks to dismiss Sports Quest's claim of tortious interference with contract and prospective business advantage as to the sale and resale of die-cast cars. Sports Quest bases the tortious interference claim on Action's decision to sell die-cast cars directly to Hamilton. The decision effectively eliminated Sports Quest as the intermediary between Action and Hamilton.

{44} A claim for tortious interference with contract exists where the defendant knows of a contractual relationship between two parties and *without justification* induces one party to breach the contract. *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)(emphasis added). Interference with a contract is justified if it is motivated by a legitimate business purpose**,** as when the plaintiff and the defendant, an outsider, are competitors. *Embree Constr. Group, Inc. v. Rafcor, Inc.,* 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992). The elimination of Sports Quest as a middleman constituted a legitimate business purpose: it saved money. No obligation with Sports Quest prevented Action from directly selling to Hamilton.

{45} Sports Quest, moreover, admittedly competed directly with Action for Hamilton's die-cast car business. Sports Quest's role as an intermediary between Action and Hamilton caused a significant increase in the price of die-cast cars. The decision to eliminate Sports Quest enabled Hamilton to obtain a lower price and Action to eliminate a competitor. By settling with Hamilton on the terminated contracts, Sports Quest waived its claims for inducement of the breach of those contracts. *Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 592, 581, S.E.2d 68, 78 (2003)(citing *Chemimetals Processing, Inc. v. Schrimsher*, 140 N.C. App. 135, 138, 535 S.E.2d 594, 596 (2000)). The interference with contract claim has no basis because as Sports Quest's competitor Action was justified in eliminating the intermediary role in order to obtain Hamilton's business and maintain a relationship with DEI.[3]

{46} Sports Quest also asserts a tortious interference with prospective economic advantage claim against Action. A claim for tortious interference with prospective advantage requires that a plaintiff must show that a defendant induced a third party to refrain from entering into a contract with a plaintiff without justification. *DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572; 585, 561 S.E.2d 276, 286 (2002). The North Carolina Supreme Court held that tortious interference with prospective economic advantage occurs when a party interferes with the freedom of contract and "not in the legitimate exercise of defendant's own right, but with design to injure the plaintiff, or gaining some advantage at his expense." *Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., Inc.,* 330 N.C. 666, 680, 412 S.E.2d 636, 644 (1992). Action had sufficient justification because Sports Quest was a competitor, and removing an intermediary allowed Action to sell products to Hamilton at a lower price. Action legitimately exercised the right to expand its direct distribution relationship with Hamilton. Sports Quest also fails to allege with any particularity that Action deterred Hamilton from entering into a contract with Sports Quest.

{47} The tortious interference claims do not assert that Action engaged in any conduct that did not advance a legitimate business purpose. The Court cannot punish Action for attempting to lower prices, obtaining business from a competitor and contracting the distribution chain. This conduct advanced legitimate business purposes and thus exculpates Action from a claim for tortious interference with contract or prospective economic advantage.[4]

## D.

{48} Sports Quest alleges that Action engaged in civil conspiracy to destroy its business. A valid civil

conspiracy claim requires an agreement between two or more individuals to commit an illegal act that results in an injury to the plaintiff pursuant to a common scheme. *Privette v. Univ. of North Carolina*, 96 N.C. App. 124, 139, 385 S.E. 2d 185, 193 (1989). The absence of an illegal act is fatal to Sports Quest's civil conspiracy claim. Action's decision to discontinue sales to Sports Quest does not rise to the level of an illegal act. Suppliers are free to contract with whomever they please and structure the distribution chain accordingly.[5] In the era of Internet and direct sales, conspiracy claims would overrun the courts if the elimination of the "middleman" in the supply chain constituted an illegal act. Moreover, judicial intervention into how parties choose and structure legitimate business relationships is beyond the power of the courts.

{49}    Action was free to sell directly to Hamilton to protect a relationship with a large customer. Pressure from DEI on Action to discontinue the relationship is irrelevant. The exclusion of one customer to strengthen ties with a larger customer is legal and a normal occurrence in commerce.

E.

{50}    To succeed on a claim for unfair and deceptive trade practices in North Carolina, plaintiff will need to establish three factors: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, which (3) proximately causes actual injury to plaintiff. *See Murray v. Nationwide Mutual Ins. Co.*, 123 N.C. App. 1, 9, 472 S.E.2d 358, 362 (1996). In order to establish that unfair and deceptive trade practices occurred, plaintiff must prove egregious conduct on the part of defendants. "The term 'unfair' has been interpreted by our Courts as meaning a practice which offends established public policy, and which can be characterized by one or more of the following terms: 'immoral, unethical, oppressive, unscrupulous or substantially injurious.' " *Id.*

{51}    The behavior of Action towards Sports Quest does not rise to the level of unfair in that it does not violate the moral standards or ethics of the business community. Action merely took measures to protect its own business interests that happened to be detrimental to Sports Quest's financial condition. Every business transaction impacts a party either through its participation in or through its exclusion from the deal. Absent the presence of an act that violates moral, ethical, or legal standards, the courts cannot punish a business solely because a transaction financially harms another entity. That is competition. An unfair trade practice requires more than a negative impact on a party.

{52}    Sports Quest does not allege that Action engaged in any activity that rises to the level of an unfair trade practice. Action terminated its relationship with Sports Quest and was free to make that choice. The motivations of Action in ceasing business with Sports Quest are irrelevant unless Action engaged in a morally or ethically questionable activity. Sports Quest made no factual allegation against Action that provides a basis to maintain an unfair trade claim.

{53}    Sport Quest's claim under the Unfair Trade Practices Act is not a valid claim because Action did not breach a contract. North Carolina law clearly supports the proposition that a breach of contract, even if intentional, does not alone constitute an unfair trade practice. *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62 418 S.E.2d 694, 700 (1992). In this case, Action did not even commit a breach of contract, and nothing in the pleadings suggests that it committed an immoral or unethical act. *See supra* Part III.B (explaining that Action did not breach a contract with Sports Quest). The absence of a breach of contract further evidences that Action did not conduct itself in a manner that constituted an unfair trade practice under North Carolina law.

F.

{54}    Sport Quest has no grounds in which to maintain an action against Wagenhals. The allegations against Wagenhals do not establish a theory of liability that sustains any cause of action against him as an individual. The causes of action that Sports Quest asserts against Wagenhals all involve his actions in the capacity as CEO of Action and not as an individual. Wagenhals also took no action that would support any of the claims discussed above. *See supra* Parts III.A-E. Regardless of the validity of Sports Quest's claims against Action,

the claims fail to provide any rationale as to why Wagenhals would be individually liable for a finding against Action.

## IV.
## MOTION FOR SUMMARY JUDGMENT

### A.

{55}     North Carolina courts recognize the use of partial summary judgment under Rule 56(d) of the North Carolina Rules of Civil Procedure to simplify cases by disposing of those issues ripe for summary judgment. N.C.G.S. §1A-1, Rule 56(d); *see Case v. Case*, 73 N.C. App. 76, 325 S.E.2d. 661, *rev. denied,* 313 N.C. 597, 330 S.E.2d 606 (1985); *Hill Truck Rentals, Inc. v. Hubler Rentals, Inc.,* 26 N.C. App. 175, 215 S.E.2d. 398 (1975).

{56}     The North Carolina Court of Appeals has explained that a summary judgment movant may meet its burden of showing that it is entitled to judgment as a matter of law by showing either (1) an essential element of the non-movant's claim does not exist, (2) the non-movant cannot produce evidence to support an essential element of the claim, or (3) the non-movant cannot surmount an affirmative defense which would bar the claim. *Taylor v. Ashburn*, 112 N.C.App. 604, 606-607, 436 S.E.2d 276, 278 (1993), *cert. denied*, 336 N.C. 77, 445 S.E.2d 46 (1994). Once the defendants have met their burden by proving that an essential element of the opposing party's claim does not exist or by showing through discovery that the opposing party cannot produce evidence to support an essential element of its claim, the burden shifts to the non-moving party to show that a genuine issue exists by forecasting sufficient evidence of all essential elements of the claim. *Farrelly v. Hamilton Square*, 119 N.C.App 541, 459 S.E.2d 23 (1995).

{57}     Summary judgment may not be used to resolve factual disputes that are material to the disposition of the action. *Robertson v. Hartman*, 90 N.C. App. 250, 252, 368 S.E.2d 199, 200 (1988). A court, moreover, cannot usually grant a motion for summary judgment when a state of mind such as intent, motive or knowledge is at issue. *See Valdese General Hospital v. Burns*, 79 N.C. App. 163, 165 339 S.E. 2d 23, 25 (1986).

### B.

{58}     The standard for summary judgment is high and requires a clear view of the facts surrounding a case. The essential facts of the case between DEI and Sports Quest are in dispute, and the evidence cited in the briefs submitted does not meet the standard necessary to grant a summary judgment motion in favor of either of those parties. The parties also base their motions on the circumstances surrounding the June 15th letter. The arguments advanced in favor of summary judgment involve the motives and intent for the creation and execution of the June 15th letter.

{59}     The standard for summary judgment does not allow the Court to determine the state of mind of Frady or the Earnhardts in this phase of the case. *See id.* The parties clearly disagree as to why DEI and Sports Quest executed the June 15th letter as well as to the events that led up to that meeting. The Court is not a finder of fact and cannot act as a jury in the summary judgment phase. The Court will revisit the motion for summary judgment in the context of the recently submitted briefs addressing specific claims.

{60}     The Court, therefore, denies all motions for summary judgment at this time; but grants Action and Wagenhals' motions to dismiss.

## CONCLUSION

It is, therefore, ORDERED, ADJUDGED AND DECREED:

1. The claims against Action are DISMISSED.
2. The claims against Fred Wagenhals are DISMISSED.
3. The motion to dismiss Sports Quest's claims for the invocation of Fifth Amendment privilege by Frady

is DENIED.

4. Sports Quest will be prohibited from offering evidence at trial to contradict evidence on issues in which Frady has claimed his Fifth Amendment privilege.

This the _____ day of February 2004.

---

[1] Hamilton already had paid Sports Quest for these cars.

[2] The cases that DEI cites to support this proposition rely on the persuasive authority of*Christensen v. Christensen*, 281 Minn. 507, 162 N.W.2d 194 (1968). The case is a family law action with a set of facts that limits its application to divorce proceedings or questions addressing facts that would create affirmative defenses. Neither of these factual scenarios presents itself in this case.

[3] Additionally, Sports Quest's allegations do not support a claim that a contract existed between Hamilton and Sports Quests other than purchase orders for die-cast cars. The lack of a contract is also fatal to Sports Quest's tortious interference with contract claim against Action.

[4] To the extent Action responded to a request from DEI, it had a further business reason to keep its most lucrative licensor happy.

[5] "Freedom of contract, unless contrary to public policy or prohibited by statute, is a fundamental right included in our constitutional guaranties. Constitution, Art. I, sec. 17; *Alford v. Ins. Co.*, 248 N.C. 224, 103 S.E. 2d 8; 12 Am. Jur. 641, 642." *Muncie v. Inse Co.*, 253 N.C. 74, 79, 116 S.E. 2d 474, 478 (2000).