Auto Provisions, LLC v. G1.34 Holdings, LLC, 2026 NCBC 40.

STATE OF NORTH CAROLINA

WAKE COUNTY

AUTO PROVISIONS, LLC and
RECON PARTNERS, LLC,

        Plaintiffs and
        Counterclaim Defendants,

v.

G1.34 HOLDINGS, LLC,

        Defendant and
        Counterclaim Plaintiff.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV010060-910

**ORDER AND OPINION ON
PLAINTIFFS' MOTIONS FOR
SUMMARY JUDGMENT**

1.    **THIS MATTER** is before the Court following the 2 October 2025 filings of (1) the *Motion for Partial Summary Judgment* (the RP Motion), filed by Plaintiff and Counterclaim Defendant Recon Partners, LLC (RP), (ECF No. 80 [RP Mot.]); and (2) *Auto Provisions, LLC's Motion for Summary Judgment* (the AP Motion; and with the RP Motion, the Motions), filed by Plaintiff and Counterclaim Defendant Auto Provisions, LLC (AP), (ECF No. 82 [AP Mot.]).

2.    Pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the Rule(s)), the Motions, either in whole or in part, seek summary judgment as to the claims and counterclaims asserted in this action. (*See generally* RP Mot.; AP Mot.)

3.    For the reasons set forth herein, the Court **GRANTS** in part and **DENIES** in part the Motions.

*Michael Best & Friedrich LLP by Justin G. May and Matthew B. Couch, for Plaintiff and Counterclaim Defendant Auto Provisions, LLC.*

*Wyrick Robbins Yates & Ponton LLP by Charles George and Josey L. Newman, for Plaintiff and Counterclaim Defendant Recon Partners, LLC.*

*Parry Law, PLLC by Jonah Garson and K. Alan Parry, for Defendant and Counterclaim Plaintiff G1.34 Holdings, LLC.*

Robinson, Chief Judge.

## I.    INTRODUCTION

4.    This action arises from a soured business relationship between members of an LLC and their respective owners.  AP and RP, on the one hand, and G1.34 Holdings, LLC (G1.34), on the other hand, each accuse the other(s) of materially breaching their respective contractual obligations, and G1.34 further claims that AP has breached fiduciary duties owed to G1.34 and that both AP and RP have been unjustly enriched and breached implied duties of good faith and fair dealing.

## II.    FACTUAL BACKGROUND

5.    The Court does not make findings of fact when ruling on a motion for summary judgment.  "[T]o provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication."  *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sep. 26, 2017); *see also Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975) (encouraging the trial court to articulate a summary of the material facts considered not at issue justifying entry of judgment).

## A. The Parties

6. AP is a North Carolina limited liability company with its principal place of business in Wake County, North Carolina. (J.A. 2 at ¶ 1, ECF Nos. 90–100.)[1] AP is owned and managed by Jeffrey Chapman (Chapman) and his wife, Stefanie Chapman (Ms. Chapman). (J.A. 498 at 126:7–8; J.A. 607 at 20:4–5, 12–18; J.A. 342 at ¶ 5.)

7. RP is a North Carolina limited liability company with its principal place of business in Wake County, North Carolina. (J.A. 2 at ¶ 2.)

8. G1.34 is a North Carolina limited liability company with its principal place of business in Wake County, North Carolina. (J.A. 2 at ¶ 3; J.A. 237 at ¶ 3.) G1.34 is owned and managed by Dr. Nick Medendorp (Dr. Medendorp) and his wife, Molly Medendorp (Ms. Medendorp). (J.A. 341–42 at ¶ 4; J.A. 709 at 18:8–16; J.A. 710 at 19:9–14.)

## B. RP's Formation

9. RP was formed on or about 15 November 2019. (*See* J.A. 101.) Around the same time, AP was created to become a joint owner in RP. (*See* J.A. 493 at 121:9–12, 23–24.)

10. AP and G1.34 are the sole members of RP, with AP holding a sixty percent (60%) interest and G1.34 holding a forty percent (40%) interest. (J.A. 118; J.A. 341–42 at ¶¶ 4–5; J.A. 607 at 20:6–11.)

---

[1] The joint appendix of exhibits submitted by the parties is expansive and, as a result, is split across eleven separate record filings. (ECF Nos. 90–100.) For ease of reference, the Court cites to the joint appendix as follows: (J.A. [ ] at [ ].). The Court cites using the joint appendix number found in red at the top of each page.

11.     RP was created to develop and market automotive reconditioning software for automotive dealerships and to "provide its software as a service, partnering with auto dealerships to operate and manage the vehicle reconditioning process." (J.A. 341 at ¶ 3; J.A. 343 at ¶ 11; J.A. 493–94 at 121:23–122:3.)

### 1.     The Framework Document

12.     On or about 7 November 2019, Chapman and Dr. Medendorp executed a document pertaining to certain aspects of RP's foundation (the Framework Document).  (J.A. 1384–85; *see also* J.A. 792 at 283:16–17; J.A. 530 at 222:6–16.)

13.     The Framework Document was signed by Dr. Medendorp on behalf of G1.34 and Chapman on behalf of NewChap, LLC[2].  (J.A. 1384–85; *see also* Answer[3] ¶ 37, ECF No. 27 [Reply Countercls.] (admitting, in relevant part, that the Framework Document was signed on or about 8 November 2019 by Chapman and Dr. Medendorp).)

14.     The Framework Document outlined that NewChap, LLC and G1.34 would own sixty percent (60%) and forty percent (40%) of RP, respectively, and contemplated that NewChap, LLC would "provide software specification expertise, industry knowledge and contacts, [and] cover pro-rate [sic] share of operating expenses[,]" while G1.34 would "cover costs of software development, provide IT expertise, [and] cover pro-rata share of operating expenses[.]"  (J.A. 1384.)

---

[2] The Framework Document refers to a NewChap, LLC, as AP had not been formed at the time Chapman and Dr. Medendorp created and signed the Framework Document.  (*See* J.A. 790 at 281:13–23.)

[3] Although entitled *Answer*, this filing actually constitutes a reply to G1.34's counterclaims.

15. The Framework Document also provided an agreed-upon definition of Minimum Viable Product (MVP) and contemplated that (i) G1.34 would provide capital to RP "for software development until MVP is fully usable"; (ii) RP would contract separately and directly with software developers; (iii) G1.34 would receive an additional nine percent (9%) equity "at completion of MVP and [when] first client revenue has begun"; (iv) G1.34 would be "reimbursed it's [sic] capital associated with [software development] as note repayment after completion of MVP and [when] first client revenue has begun"; and (v) NewChap, LLC would use its portion of RP profits to pay back "G1.34 development capital as note payable until pro rata portion is fully repaid." (J.A. 1384–85.)

16. Subsequently, the Framework Document was provided to an attorney "to create the [O]perating [A]greement." (J.A. 794 at 285:16–18; J.A. 795 at 286:22–23 (the Framework Document "was the foundation for the [O]perating [A]greement"); J.A. 712–13 at 55:20–56:2; J.A. 530 at 222:10–16.)

### 2. The Operating Agreement

17. On 6 December 2019, following the formation of RP, Chapman and Dr. Medendorp executed the Operating Agreement of RP. (J.A. 100–29; J.A. 343–44 at ¶ 11; J.A. 96 at ¶ 6.)

18. The Operating Agreement provides that Chapman is the manager of RP. (J.A. 103–04 at § 3.1; *see also* J.A. 543 at 254:18–19.)

### i. Software Development Funding and Repayment

19.     Section 11.1 of the Operating Agreement provides that "[RP] shall directly enter into contracts with programmers for the development of computer software (the 'Software'), and G1.34 . . . shall immediately remit payments to [RP] in the amount of any invoices received by [RP] for the Software." (J.A. 113 at § 11.1.)

20.     Pursuant to Section 11.2 of the Operating Agreement, AP is required to transfer nine percent (9%) of its membership interest in RP to G1.34 "once (i) G1.34 has developed a Minimum Viable Product[4] from the Software . . . and (ii) [RP] generates revenue of at least $10,000.00 from clients that have contracted to purchase and/or subscribe for such product." (J.A. 113 at § 11.2.)

21.     Further, the Operating Agreement provides that G1.34 is entitled to reimbursement of its "prefunding and/or invoice payment for the Software at the end of each month during which [RP] earns profits of at least $10,000.00 from clients that have contracted to purchase and/or subscribe for such product." (J.A. 113 at § 11.3.)

### ii. Member Rights

22.     Pursuant to Section 4.7 of the Operating Agreement, the Manager of RP is required to furnish to each Member (i) unaudited quarterly financial statements for each of the first three fiscal quarters of each fiscal year within forty-five (45) days after the end of each fiscal quarter; and (ii) audited financial statements within ninety (90) days after the end of each fiscal year. (J.A. 106 at § 4.7.)

---

[4] The agreed-upon definition and requirements for achievement of MVP are set forth in Exhibit A to the Operating Agreement. (*See* J.A. 127–28.)

23.     The Operating Agreement further provides that "[t]he Members shall have the right to review all material contracts and agreements being considered by [RP] prior to execution by the Manager." (J.A. 106 at § 4.8.)

### iii.     Buy-Sell Process

24.     Pursuant to Section 9.1 of the Operating Agreement, "[a]ny material breach of this Agreement by a Member which is not cured within 10 days after [RP] delivers written notice of such breach to the Member" constitutes a "Buy-Sell Event." (J.A. 109 at § 9.1(e).)

25.     The occurrence of a valid Buy-Sell Event entitles the remaining Members of RP to exercise an option to purchase the breaching Member's membership interest. (J.A. 110 at § 9.3.)

### iv.     Indemnification

26.     Section 4.6 of the Operating Agreement provides:

> Each Member agrees to indemnify, defend and hold the other Members and [RP], and each of the Members' and [RP's] respective members, managers, shareholders, directors, officers, representatives, employees and agents harmless from and against any and all losses resulting or arising from, relating to or incurred in connection with (i) any breach of any representation or warranty of such Member contained in this Agreement or any other document delivered by such Member in connection herewith; or (ii) any breach of or failure to comply with any covenant of such Member contained in this Agreement or any other document delivered by such Member in connection herewith.

(J.A. 106 at § 4.6.)

27.     The Operating Agreement further provides that:

> G1.34 agrees to indemnify, defend, protect, and hold harmless [RP] from and against any loss, liability, damages, costs or expenses (including interest, penalties and reasonable attorney's fees), actually paid by [RP]

resulting from and directly and proximately caused by: (i) a breach of G1.34's material representations, warranties, covenants or other obligations related to the Software and as set forth in this Agreement; (ii) defects in materials, supplies, or products related to the Software and furnished by on behalf of [sic] G1.34; and (iii) the claims of any customer, vendor or supplier of [RP] related to the Software to the extent [RP] is not liable under this Agreement with respect to the claim being asserted.

(J.A. 113 at § 11.1.)

## C.    RP's Business Operations and Software Development

28.    Pursuant to its obligation under Section 11.1 of the Operating Agreement, and at the recommendation of Dr. Medendorp, RP engaged Successive Technologies, LLC (Successive) for the development of the Software. (J.A. 536 at 243:6–8; J.A. 539 at 250:18–19; J.A. 740 at 118:12–19.)

29.    On or about 13 September 2020, RP and Successive executed both a Master Services Agreement and an initial Statement of Work (SOW 1) for the software development project. (J.A. 536 at 243:16–22; J.A. 299 at ¶¶ 8, 10; *see also* J.A. 346–47 at ¶ 20; J.A. 1412–30.)

30.    Dr. Medendorp, on behalf of RP, entered into a licensing agreement with EVOX Productions, LLC (EVOX) "for automobile images used for marketing and vehicle identification[.]" (J.A. 350 at ¶ 31; J.A. 300 at ¶ 17.)

31.    In October 2021, Dr. Medendorp, on behalf of RP, entered into an agreement with Microsoft for cloud storage. (J.A. 301 at ¶ 23; J.A. 350 at ¶ 31.)

32.    Dr. Medendorp, on behalf of RP, also entered into an agreement with SendGrid for SMS and email communications such as advisor alerts. (J.A. 301 at ¶ 29; J.A. 350 at ¶ 31; *see also* J.A. 765 at 219:10–14; J.A. 766 at 220:8–14.)

33.     On 25 November 2022, a project manager with Successive submitted a certificate of completion to Chapman and Dr. Medendorp relating to SOW 1. (J.A. 1386.)

34.     Thereafter, on 20 December 2022, Successive provided Chapman and Dr. Medendorp a list of items Successive suggested required "code refactoring." (*See* J.A. 1387–91; J.A. 549–50 at 260:20–261:11; J.A. 753–54 at 148:20–149:4.)

35.     On 19 January 2023, RP and Successive entered into a second Scope of Work Agreement (SOW 2) for the purpose of "refactoring" and optimizing the Software code. (J.A. 1392–98; *see* J.A. 753–54 at 148:20–149:4; J.A. 348 at ¶ 25; J.A. 549–50 at 260:20–261:5.)

36.     The refactoring project was completed in May 2023. (*See* J.A. 1433.)

**D.     Disputes Giving Rise to Litigation**

**1.     First Purported Breach by G1.34**

37.     On 18 September 2023, Dr. Medendorp, in an email to Chapman and his attorney, identified several invoices for EVOX, Microsoft, and Twilio[5] from between July 2023 and August 2023 that G1.34 contends are for operating expenses, as opposed to software development, and, therefore, beyond the scope of what G1.34 is required to pay for under the Operating Agreement. (*See* J.A. 1399–400.)

---

[5] Twilio and SendGrid are used interchangeably by the parties to refer to the same invoices. Dr. Medendorp explained in his deposition that SendGrid and Twilio "are two companies that are basically the same – same entity. One sends text messages. The other one is an e-mail server for systems like ours to send messages out." (J.A. 765 at 219:10–14; *see also* J.A. 1460 (invoice from Twilio Inc. containing a logo naming both Twilio and SendGrid).)

Dr. Medendorp demanded immediate reimbursement to G1.34 of G1.34's payment for those invoices.[6] (J.A. 1400.)

38. On 25 September 2023, Chapman provided notice to G1.34 that it had materially breached its obligations under the Operating Agreement by failing to immediately remit payments to RP for certain Microsoft, EVOX, and SendGrid invoices. (J.A. 97 at ¶ 9; J.A. 321.)

39. Thereafter, on 9 October 2023, Chapman forwarded additional Microsoft, EVOX, and SendGrid invoices to Dr. Medendorp, to which Dr. Medendorp lodged the same objection—that the invoices were not for "contracts with programmers for the development of computer software" and, therefore, not G1.34's responsibility under the Operating Agreement. (*See* J.A. 1534–35.)

**2. Second Purported Breach by G1.34**

40. On or about 27 July 2023, RP obtained a third scope of work from Successive (SOW 3). (*See* J.A. 1568–73.)

41. On 9 August 2023, Chapman provided an initial SOW 3 invoice to G1.34 for payment. (*See* J.A. 1440.)

42. Two days later, on 11 August 2023, Dr. Medendorp notified Chapman that G1.34 believed SOW 3 contained "items that are outside of the contracted Exhibit A requirements for G1.34's software invoice payments" and provided examples of several items in SOW 3 that G1.34 believed already met the requirements for MVP under the Operating Agreement. (J.A. 1439–40.) Dr. Medendorp requested that

_____

[6] Dr. Medendorp raised similar objections and made demands for reimbursement on 11 September 2023 and 28 September 2023. (*See* J.A. 1527–28.)

Chapman provide a corrected SOW 3 and revised invoice containing only those items G1.34 is contractually required to pay for. (J.A. 1440.)

43. On or about 21 September 2023, RP obtained a revised SOW 3 from Successive. (J.A. 299 at ¶ 14; J.A. 1583–88.)

44. On 25 September 2023, Chapman emailed Dr. Medendorp, indicating that Successive's work on SOW 3 had been stalled based on G1.34's refusal to pay the initial SOW 3 invoice. In the email, Chapman acknowledged G1.34's contention that some of the items in the initial SOW 3 were not required to achieve MVP—and, therefore, outside of the scope of G1.34's payment obligations—and provided G1.34 the revised SOW 3 covering the items RP believed were in mutual agreement. (J.A. 1407.)

45. Thereafter, on 28 September 2023, Dr. Medendorp further objected to the revised SOW 3. (*See* J.A. 1409–10.)

46. On 5 October 2023, RP submitted the Successive invoice related to SOW 3 to G1.34 for payment, for which G1.34 refused to remit payment. (J.A. 300 at ¶¶ 15–16; *see also* J.A. 1402 (referencing the 5 October 2023 invoice from Successive).)

47. On 9 October 2023, Chapman emailed Dr. Medendorp, noting that G1.34 had failed to immediately remit payment for the SOW 3 invoice and requested that payment be sent within ten days. (J.A. 1402–03.)

48. That same day, Dr. Medendorp responded to Chapman's email (i) indicating that RP had failed to refund G1.34 $20,291.22, which G1.34 represents

is the balance of its overpayment of pre-funding for contracts with software development programmers; and (ii) authorizing RP to pay the SOW 3 invoice with those funds before returning the remainder to G1.34. (J.A. 1402.)

49. On 10 October 2023, Chapman emailed Dr. Medendorp, disputing that G1.34 is entitled to a return of the $20,291.22 used to pay bills for Microsoft, EVOX, and SendGrid, and requesting that G1.34 immediately remit payment for the SOW 3 invoice to "avoid a breach of the [O]perating [A]greement." (J.A. 1404; *see* J.A. 97 at ¶ 10.)

### 3. Notice of Purported Buy-Sell Event

50. On 10 November 2023, AP provided notice to G1.34 and RP that G1.34 had "materially breached the Operating Agreement" and triggered a Buy-Sell Event pursuant to Article 9 of the Operating Agreement. (J.A. 97 at ¶ 13; *see* J.A. 863–64.)

51. On 14 November 2023, AP provided further notice to G1.34 that it intended to exercise its right to purchase G1.34's membership interest pursuant to Section 9.3 of the Operating Agreement. (J.A. 97 at ¶ 14; *see* J.A. 865.)

52. On or about 4 December 2023, AP and G1.34 jointly engaged Economics Partners to perform a valuation of G1.34's membership interest in RP. (J.A. 182 at ¶ 4; J.A. 97 at ¶ 15; *see* J.A. 732 at 86:4–5; J.A. 803 at 316:19–20.)

53. On 8 January 2024, Economics Partners provided its valuation to AP and G1.34. (J.A. 182 at ¶ 5; J.A. 185–234; *see also* J.A. at 1591–92.)

54. Ultimately, AP and G1.34 did not close on the sale of G1.34's membership interest in RP.

## III. PROCEDURAL BACKGROUND

55. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

56. On 26 March 2024, AP and RP initiated this action upon the filing of their *Complaint*, (ECF No. 3), asserting the following claims against G1.34: (1) breach of contract – specific performance (Count One), (J.A. 8–9 at ¶¶ 53–69); (2) indemnification of AP (Count Two), (J.A. 9–10 at ¶¶ 70–76); (3) indemnification of RP (Count Three), (J.A. 10–11 at ¶¶ 77–82); and (4) declaratory judgment (Count Four), (J.A. 11 at ¶¶ 83–86).

57. On 7 May 2024, G1.34 filed the *Answer and Counterclaim of G1.34 Holdings, LLC*, (ECF No. 8), asserting the following counterclaims against AP and RP: (1) breach of fiduciary duty as to AP (Counterclaim One), (J.A. 277–79 at ¶¶ 68–75); (2) breach of contract as to RP (Counterclaim Two), (J.A. 279–80 at ¶¶ 76–82); (3) breach of implied duties of good faith and fair dealing as to RP (Counterclaim Three), (J.A. 280–81 at ¶¶ 83–86); (4) unjust enrichment as to RP (Counterclaim Four), (J.A. 281 at ¶¶ 87–91); (5) breach of contract as to AP (Counterclaim Five), (J.A. 281–82 at ¶¶ 92–97); (6) breach of implied duties of good faith and fair dealing as to AP (Counterclaim Six), (J.A. 282–83 at ¶¶ 98–101); (7) unjust enrichment as to AP (Counterclaim Seven), (J.A. 283 at ¶¶ 102–06); (8) conversion as to both AP and RP (Counterclaim Eight), (J.A. 284 at ¶¶ 107–09);[7]

---

[7] On 25 September 2024, the Court entered its *Order and Opinion on Plaintiffs' Motion to Dismiss Defendant's Counterclaims*, (ECF No. 42), dismissing with prejudice Counterclaim Eight. (J.A. 445–46 at ¶¶ 66, 70.)

and (9) declaratory judgment as to both AP and RP (Counterclaim Nine), (J.A. 284–85 at ¶¶ 110–13).

58.   On 2 October 2025, AP and RP filed the Motions.  (*See* RP Mot.; AP Mot.) Following full briefing, the Court held a hearing on the Motions on 18 February 2026 (the Hearing), at which all parties were represented by counsel.  (*See* ECF No. 109.)

59.   The Motions are ripe for resolution.

## IV.   LEGAL STANDARD

60.   Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C.G.S. § 1A-1, Rule 56(c).  "A 'genuine issue' is one that can be maintained by substantial evidence."  *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citation omitted).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference."  *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 8 (2018) (citation modified) (quoting *Ussery v. Branch Banking & Tr. Co.*, 386 N.C. 325, 335 (2015)).

61.   The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008), *aff'd* 363 N.C. 255 (2009).  The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven

at trial, or would be barred by an affirmative defense . . . or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim[.]" *Dobson*, 352 N.C. at 83 (citations omitted).

62. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000) (citations omitted). The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83 (citation omitted). However, the nonmovant

> may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

N.C.G.S. § 1A-1, Rule 56(e).

63. "For affirmative summary judgment on a party's own claim, the burden is heightened." *Futures Grp., Inc. v. Brosnan*, 2023 NCBC LEXIS 7, at *4 (N.C. Super. Ct. Jan. 19, 2023); *see also Brooks v. Mount Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726, 728 (1980). The movant "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985); *accord Kidd v. Early*, 289 N.C. 343, 370 (1976). Consequently, "rarely is it

proper to enter summary judgment in favor of the party having the burden of proof."

*Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984).

## V. ANALYSIS

64. The Court first addresses AP's and RP's requests for summary judgment on G1.34's counterclaims. The Court then considers AP's and RP's requests for affirmative summary judgment on their own claims.

### A. Counterclaim One: Breach of Fiduciary Duty Against AP

65. G1.34 asserts Counterclaim One against AP, alleging that (i) AP, by virtue of its status as majority member of RP, owed fiduciary duties to G1.34, including the duties of loyalty and due care; (ii) AP breached its fiduciary duties to G1.34; and (iii) AP's breaches have diluted the value of G1.34's membership interest and frustrated G1.34's efforts to realize value from RP, including in connection with the development of the Software. (J.A. 277–79 at ¶¶ 69–72, 74.) Specifically, G1.34 alleges AP breached its fiduciary duties by:

> a. attempting, through coercive means, to convert the value of G1.34's contributions to RP, including the "Loan" and the value of the Software G1.34 helped to develop;
>
> b. failing to disclose to G1.34 material agreements in which AP had a conflict of interest;
>
> c. failing to provide accurate and timely financial reports to G1.34; and

> d.    failing to repay misappropriated funds contributed by G1.34 for the development of the Software.

(J.A. 278 at ¶ 72.)

66.    "To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019) (citation omitted).

67.    AP seeks summary judgment on Counterclaim One for breach of fiduciary duty, arguing G1.34 has failed to produce substantial evidence of the existence of a fiduciary duty or, to the extent one exists, any breach thereof. (Mem. L. Supp. AP Mot. 16, ECF No. 103 [AP Mem. Supp.].)

68.    With respect to the existence of a fiduciary duty, AP contends that G1.34 has failed to demonstrate that AP "holds all the cards" because (1) RP is not a member-managed company; and (2) the Operating Agreement (a) expressly empowers RP's managers to make all decisions with respect to the management of RP's business and affairs, (b) prohibits member participation in management, and (c) limits the manager's authority by requiring unanimous member approval of certain acts. (AP Mem. Supp. 17–18.) Further, AP argues that the sole unique advantage received by AP as a majority member—the power to appoint and remove managers—does not justify imposing upon AP a fiduciary duty to G1.34. (AP Mem. Supp. 18.)

69.     G1.34, however, argues there is substantial evidence supporting its contention that "AP, as RP's majority member exercising total control over the affairs of the business, owed G1.34, RP's minority member, a 'special duty' to act in good faith." (Mem. L. Opp'n AP Mot. 8, ECF No. 108 [Mem. Opp'n AP Mot.].) As purported evidence that AP "holds all the cards," G1.34 points to the fact that "AP's principal, Chapman, is also RP's manager, practically sharing AP's interests in RP's management on a 1:1 basis[,]" and, more specifically, that Chapman claimed complete authority to determine whether any MVP item had been achieved and/or whether the Software would be marketed at all. (Mem. Opp'n AP Mot. 9.)

70.     G1.34 further argues that "substantial evidence also supports G1.34's contention that it suffered a personal injury, separate and distinct from any injury sustained by AP or by RP[,]" constituting additional grounds on which to conclude that AP owed fiduciary duties to G1.34. (Mem. Opp'n AP Mot. 10.) Specifically, G1.34 notes that it was solely responsible for financing development of the Software under the Operating Agreement and, therefore, "stood to suffer an injury of its own . . . if AP prevented the . . . Software from being brought to the open market by RP."[8] (Mem. Opp'n AP Mot. 10.)

---

[8] G1.34 relies on *Barger v. McCoy Hillard & Parks*, in which our Supreme Court held that shareholders of a corporation may bring claims against a third party in their individual capacity for harms to a corporation where either (1) there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder; or (2) the shareholder suffered an injury separate and distinct from that suffered by other shareholders or the corporation itself. 346 N.C. 650, 658–59 (1997); *see also Spivey v. Smith*, 2023 NCBC LEXIS 111, at *30–31 (N.C. Super. Ct. Sep. 18, 2023) (applying *Barger* to claims involving an LLC). To establish the existence of a special duty, the facts must show that the wrongdoer owed a duty to the shareholders that was personal to them in their capacity as shareholders and "separate

71. In reply, AP contends that "[t]he operative question to determine a legal fiduciary duty is the extent of AP's rights in RP[;]" thus, "[t]he identity of RP's manager is immaterial to the legal duty analysis." (AP's Reply Supp. AP Mot. 3, ECF No. 104.)

72. It is axiomatic that "[f]or a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651 (2001) (citations omitted). Members of an LLC generally do not owe fiduciary duties to one another. *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473 (2009); *see also Merrell v. Smith*, 2022 NCBC LEXIS 155, at *17 (N.C. Super. Ct. Dec. 13, 2022) (citation modified) ("The North Carolina Limited Liability Company Act does not create fiduciary duties among members.").

73. Under certain circumstances, however, a majority member exercising control over the LLC may owe fiduciary duties to minority members. *See Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *17 (N.C. Super. Ct. June 19, 2019) (citations omitted); *Kaplan*, 196 N.C. App. at 475 (noting that North Carolina courts have found fiduciary duties arise where "one party figuratively holds all the cards"). For example, a majority member's ability to control the board of directors,

and distinct from the duty . . . owed to the corporation[,]" such as when a party violated its fiduciary duty to a shareholder. *Barger*, 346 N.C. at 659.

It appears that G1.34 is conflating the *Barger* exceptions—which are applied to determine whether members of an LLC have standing to bring direct claims, as opposed to derivative claims, against third parties for harms to the LLC—with the standard applied to determine whether the majority member of an LLC owes a fiduciary duty to the minority members. As G1.34 asserts Counterclaim One against AP based on a purported fiduciary relationship between them as members, it is not clear that *Barger* is applicable.

dissolve the LLC, put the LLC into bankruptcy, and amend the LLC's operating agreement without approval from other members may reflect sufficient control to create a fiduciary duty owed to minority members. *Merrell*, 2022 NCBC LEXIS 155, at \*18 (citing *Vanguard*, 2019 NCBC LEXIS 39, at \*21); *see also Emrich Enters., LLC v. Hornwood, Inc.*, 2022 NCBC LEXIS 19, at \*4 (N.C. Super. Ct. Feb. 15, 2022) (concluding fiduciary duty existed where operating agreement provided that all decisions with respect to management of the LLC could be made by the majority member); *but see Strategic Mgmt. Decisions, LLC v. Sales Performance Int'l, LLC*, 2017 NCBC LEXIS 69, at \*13–14 (N.C. Super. Ct. Aug. 7, 2017) (concluding a majority member's authority to determine how much to pay managers, standing alone, is insufficient to give rise to a fiduciary duty).

74.     Where the LLC's operating agreement provides sufficient protection to minority members and limits the majority member's powers, a majority membership alone is insufficient to create a fiduciary duty owed to minority members. *See Wright v. Lorusso*, 2023 NCBC LEXIS 114, at \*15–17 (N.C. Super. Ct. Sep. 19, 2023). In *Wright*, this Court determined that no reasonable jury could conclude that the majority member, who was also the LLC's manager, had the controlling authority necessary to create a fiduciary duty where (i) unanimity of the members was required to amend the operating agreement and to call for a loan or capital contribution from members; (ii) the operating agreement prohibited the manager from unilaterally starting a new line of business, selling material assets of the company, or paying a salary or lending funds to any member or manager; and (iii) the operating agreement

required a supermajority to approve amendments to the articles of organization, declarations of bankruptcy, dissolution of the LLC, issuances of new ownership units, and admission of new members. *Id.* at 15–16.

75. The undisputed evidence in this case establishes that AP, as a majority member of RP, did not exercise a level of control over RP that could give rise to a fiduciary duty owed to G1.34. AP's sole unilateral authority under the Operating Agreement is its ability to appoint and remove RP's managers. (*See* J.A. 103 at § 3.1.) Additionally, the Operating Agreement expressly prohibits members from participating in the management of RP. (*See* J.A. 105 at § 4.2.) Despite these facts, G1.34 purports to impute Chapman's level of control over RP as its manager to AP to conclude that AP owes a fiduciary duty to G1.34. (*See* Mem. Opp'n AP Mot. 9.)

76. While this Court has held that the managerial authority of a majority member may demonstrate control sufficient to give rise to a fiduciary duty, such cases typically involve a majority member who also acts as the manager of an LLC. *See, e.g.*, *Wright*, 2023 NCBC LEXIS 114, at *15–17. That is not the case here as Chapman, not AP itself, is the manager of RP. G1.34 cites no authority supporting its argument that a majority member that can unilaterally appoint managers, but is a separate and distinct entity from those managers, owes a fiduciary duty to minority members based on the appointed manager's level of control over the LLC.

77. Moreover, the parties' Operating Agreement does not grant the manager unfettered control over RP. For example, the Operating Agreement prohibits the manager from merging or consolidating the LLC, selling all or substantially all the

LLC's assets, admitting new members, or changing the LLC's business without the unanimous consent of the members. (J.A. 104 at § 3.3.) The Operating Agreement also provides that all members must agree to voluntarily dissolve the LLC and amend the Operating Agreement. (J.A. 112 at § 10.1(b); J.A. 115 at § 12.6.)

78. Accordingly, the Court concludes that there is no genuine issue of material fact that AP, as the majority member of RP, owes no fiduciary duties to G1.34. In the absence of such duties, there can be no breach of fiduciary duty. Therefore, the Court **GRANTS** in part the AP Motion as to Counterclaim One for breach of fiduciary duty.

### B. <u>Counterclaim Two: Breach of Contract Against RP</u>

79. G1.34 brings Counterclaim Two for breach of contract against RP, alleging that RP has materially breached its express and implied contractual obligations to G1.34 (i) "under the Operating Agreement . . . by failing to provide correct and timely financial statements to [G1.34], and, upon information and belief, by failing to provide material [RP] contracts for [G1.34's] review prior to their execution[;]" and (ii) "under the Loan Agreement . . . by repudiating the Loan Agreement and failing to pay amounts due thereunder." (J.A. 279–80 at ¶¶ 79–80.)

80. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000) (citation omitted). A "[b]reach of contract occurs when a party fails to perform a contractual duty which has become absolute." *Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 510 (1987) (citation omitted). "[W]hen performance of a duty under contract is presently due any nonperformance

constitutes a breach." *Id.* "In order for a breach of contract to be actionable it must be a material breach, one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Long v. Long*, 160 N.C. App. 664, 668 (2003) (citation omitted). The materiality of a breach of contract is "ordinarily a question for a jury." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 221 (2015) (citation modified).

81.     Further, "[i]f the contract contains some condition precedent to defendant's liability, the plaintiff must also allege that the condition has been met." *Upchurch v. Sapp*, 2020 NCBC LEXIS 118, at *5 (N.C. Super. Ct. Oct. 8, 2020) (citation modified). "A condition precedent is a fact or event that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty." *Mosely v. WAM, Inc.*, 167 N.C. App. 594, 600 (2004) (citation omitted).

82.     RP seeks summary judgment on Counterclaim Two for breach of contract related to the Operating Agreement and the "Loan Agreement." (Mem. Supp. RP Mot. 7, ECF No. 101 [RP Mem. Supp.].)

### 1.     The "Loan Agreement"

83.     With respect to the purported "Loan Agreement," RP contends it is entitled to summary judgment on Counterclaim Two because "there is no genuine dispute that a 'Loan Agreement' does not exist separate and apart from the Operating Agreement." (RP Mem. Supp. 8; *see also* Reply Countercls. ¶ 80 (expressly denying that a "Loan Agreement" exists).)  RP argues the 7 November 2019 Framework Document was merely a basis for the Operating Agreement that Chapman and

Dr. Medendorp provided to an attorney as the "foundation for the [O]perating [A]greement[,]" and that the funding and repayment concepts in that document were subsequently memorialized in, and thus merged into, Article 11 of the Operating Agreement. (RP Mem. Supp. 8–10.) Further, RP argues G1.34 has failed to identify any funds loaned to RP pursuant to the terms of the purported "Loan Agreement" that were different from monies provided pursuant to Section 11.1 of the Operating Agreement. (RP Mem. Supp. 10–11.)

84. Moreover, RP contends that even assuming the Framework Document constitutes a separate agreement, it was executed prior to the formation of RP and there is no evidence that it was subsequently ratified and adopted by RP. (RP Mem. Supp. 11.)

85. G1.34 argues that "[s]ubstantial evidence in the record does show that RP, AP, and Chapman characterized G1.34's contributions as a loan." (Mem. L. Opp'n RP Mot. 7 n.1, ECF No. 105 [Mem. Opp'n RP Mot.].) The Court disagrees. Upon review of the record, the Court concludes that G1.34 has not presented sufficient evidence showing that it can establish at trial the existence of a valid, separate "Loan Agreement."

86. Although the Operating Agreement does not contain a merger clause, it is undisputed that the parties provided the Framework Document to an attorney as the basis for the creation of the Operating Agreement. (J.A. 794 at 285:16–18; J.A. 795 at 286:22–23; J.A. 712–13 at 55:21–56:2; *see also* J.A. 530 at 222:10–16.)

87.     It is also undisputed that the Operating Agreement contains provisions providing the mechanism for repayment of G1.34's financial contributions. (*See* J.A. 113 at § 11.3.) In fact, at her deposition, Ms. Medendorp testified that the "Loan Agreement" referenced in Counterclaim Two refers to Article 11 of the Operating Agreement. (J.A. 992 at 148:4–18.) Dr. Medendorp, though denying that the Framework Document merged into the Operating Agreement,[9] testified that the Operating Agreement provides a mechanism for repayment of the money G1.34 provided for Software development. (J.A. 798 at 289:6–14; *see also* J.A. 799 at 290:4–13; J.A. 800 at 291:2–3.)

88.     At best, the evidence cited by G1.34 shows that RP listed G1.34's financial contribution as a "Loan From G1.34 Holdings, LLC" on certain of RP's transaction reports and balance sheets and that Doug Dreher, an accountant for RP, acknowledged in an email to Chapman that the "loans from G1[.]34" show up on RP's balance sheet. (*See* J.A. 1468; J.A. 556–57.) Chapman has testified, however, that he understood the contributions were listed as loans in the transaction reports as a means of cleanly tracking the money. (*See* J.A. 529 at 221:13–22; J.A. 533 at 233:17–20; J.A. 535 at 242:1–8.) The fact that RP's financial documents refer to the money as a "loan" does not in itself create a genuine issue of material fact as to whether a "Loan Agreement" in fact exists separate and apart from Article 11 of the Operating Agreement. Moreover, Chapman has expressly denied the existence of any

---

[9] Specifically, Dr. Medendorp testified that the Framework Document "contains a lot of information regarding the foundation of the company *as well as the loan agreement*." (J.A. 738 at 108:1–3 (emphasis added).)

"Loan" or separate "Loan Agreement," and G1.34 has not presented any evidence tending to show that Chapman or RP ever acknowledged or conceded that RP had received a "Loan" from G1.34 pursuant to a "Loan Agreement" or that RP was bound by the terms of the Framework Document upon execution of the Operating Agreement. (*See* J.A. 527–28 at 214:18–215:10; *see also* J.A. 530 at 222:6–16 (Chapman's testimony that "not everything in these initial documents translated over" when the parties agreed to the terms of the Operating Agreement).)

89. Even assuming *arguendo* that the Framework Document constitutes a separate "Loan Agreement" binding against RP, Counterclaim Two still necessarily fails. The terms contained in the Framework Document, like the Operating Agreement, establish conditions precedent to G1.34 receiving reimbursement of funds contributed for development of the Software—namely, that MVP status be achieved and client revenue begin. (J.A. 1384.) Although the Framework Document does not set any threshold amount of revenue, the Operating Agreement provides that G1.34 will receive reimbursement "at the end of each month during which the Company earns profits of at least $10,000.00 from clients that have contracted to purchase and/or subscribe for such product[,]" and Dr. Medendorp has acknowledged that the revenue threshold is $10,000.00. (J.A. 113 at § 11.3; *see* J.A. 344–45 at ¶ 14.)

90. The record before the Court is devoid of any evidence showing that G1.34 has obtained *any* client revenue, let alone $10,000.00. Dr. Medendorp testified that he does not recall the RP financial reports, through Q2 of 2024, reflecting gross profits of at least $10,000.00 from clients. (J.A. 737 at 107:1–8; *see also* J.A. 983 at 70:15–25

(Ms. Medendorp's testimony that she has no personal knowledge of $10,000.00 in revenue being received).) Brian Burns—who provided a valuation of G1.34's membership interest in RP—testified that as of 31 October 2023, RP had not generated $10,000.00 in revenue. (J.A. 1227 at 78:8–10.) Further, G1.34 does not provide any evidence that the revenue threshold has been met.[10]

91. In the absence of evidence that RP generated $10,000.00 in client revenue, there exists no genuine dispute that G1.34 is not presently entitled to repayment of its financial contributions pursuant to either the terms of the Operating Agreement or, to the extent it could be considered a separate, binding contract, the Framework Document.[11]

---

[10] G1.34 has suggested both in its brief and at the Hearing that, to the extent the revenue threshold was not satisfied, RP still breached the "Loan Agreement" because Chapman intentionally prevented revenue from being generated to satisfy the condition precedent. (*See* Mem. Opp'n RP Mot. 9, 13.)

The express language of G1.34's allegations as to Counterclaim Two, however, provides that G1.34 has "satisfied all conditions precedent to recovering the relief sought in this action." (J.A. 279 at ¶ 78.) G1.34 does not otherwise allege that the satisfaction of any condition precedent was prevented by the actions of RP. Moreover, at an earlier hearing on AP and RP's motion to dismiss G1.34's counterclaims, counsel for G1.34 represented that the allegations in Counterclaim Two were that the $10,000.00 revenue condition precedent had been satisfied. (J.A. 388 at 32:12–18; J.A. 398 at 43:18–23.)

"It is well understood that . . . a party to a suit should not be allowed to change his position with respect to a material matter in the course of litigation." *Ingram v. Yadkin River Power Co.*, 181 N.C. 359, 360 (1921) (citation omitted). In both briefing and at the Hearing, AP and RP have argued that G1.34 should be prohibited from raising this argument at the summary judgment stage. The Court agrees and, accordingly, does not consider G1.34's argument regarding prevention of the satisfaction of a condition precedent.

[11] For purposes of clarity, the Court need not—and does not—reach the issue of whether a genuine issue of material fact exists as to whether MVP has been achieved because the Court concludes herein that the other condition precedent to G1.34's receipt of repayment and/or additional equity—achievement of $10,000.00 in client revenue—has not been satisfied.

92.     Therefore, the Court **GRANTS** in part the RP Motion as to Counterclaim Two for breach of contract as it relates to the purported "Loan Agreement."

### 2.     The Operating Agreement

93.     As to the Operating Agreement, RP contends it is entitled to summary judgment on Counterclaim Two because (i) Dr. Medendorp testified at his deposition that he had received all financial reports from RP's accountant, Doug Dreher, through Q2 of 2024; (ii) RP has not failed to provide any material contracts to G1.34 for review; and (iii) even assuming RP did breach the Operating Agreement with respect to the financial statements and material contracts, those alleged breaches are not actionable because they are not material.  (RP Mem. Supp. 11–13.)

94.     G1.34 contends there is substantial evidence of such breaches in the record and that whether the alleged breaches were material is a question for the jury.  (Mem. Opp'n RP Mot. 8.)

### i.     Financial Statements

95.     As purported evidence of a breach of Section 4.7 of the Operating Agreement, G1.34 cites a 21 April 2023 demand letter it sent to RP in which G1.34 claimed Chapman violated the Operating Agreement by, in relevant part, submitting an inaccurate quarterly financial report to the members in 2023. (J.A. 1474–77.) The fact that G1.34 claimed such a breach by Chapman and demanded RP investigate such claim is not, however, evidence of an actual breach of the Operating Agreement. G1.34 also cites a 26 June 2023 email from Chapman to RP's accountants in which it is implied that Dr. Medendorp had not yet received the Q2 financial reports for 2023.

(J.A. 1466.) At the time this email was sent, however, the Q2 reports were not yet due and, therefore, the email is not evidence that a breach occurred.

96. The only evidence cited by G1.34 which shows that Chapman, as the manager of RP, actually failed to provide timely financial reports to G1.34 is a 17 April 2023 email from RP's accountant, Doug Dreher, to Chapman, in which Dreher advises Chapman that the ninety-day deadline provided in Section 4.7 of the Operating Agreement by which RP's manager is required to provide audited financial statements for the fiscal year had already passed. (J.A. 1517.) RP concedes that the email "could be some evidence of the failure to provide required financial statements timely[.]" (Reply Supp. RP Mot. 6, ECF No. 102.)

97. The Court, therefore, concludes that a genuine issue of material fact exists regarding whether Chapman's failure, as the manager of RP, to provide G1.34 with timely audited financial statements for fiscal year 2023 constitutes a material breach of Section 4.7 of the Operating Agreement by RP. Therefore, the Court **DENIES** in part the RP Motion as to Counterclaim Two to that limited extent.

98. To the extent Counterclaim Two is based on the alleged failure to timely provide any other financial statements, the Court concludes that G1.34 has not shown that a genuine issue remains for trial regarding such alleged breaches and, therefore, the Court **GRANTS** in part the RP Motion as to Counterclaim Two to that extent.

### ii.    Material Contracts

99. With respect to the alleged breach by RP for failing to provide G1.34 material contracts for review, the only document cited by G1.34 as evidence of a

breach is an email thread between Chapman and David Holmes, an insurance agent, in which Chapman inquires about obtaining errors and omissions insurance. (J.A. 1478–85.) The record is devoid of any further documentation or testimony showing that a draft contract for errors and omissions coverage was submitted to RP or that a contract for errors and omissions insurance was ever entered into by RP. Similarly, no evidence was presented that any other material contract was entered into without G1.34's review, and G1.34 may not rest on the allegations of its counterclaims to create a genuine issue for trial. *See* N.C.G.S. § 1A-1, Rule 56(e).

100. Therefore, the Court **GRANTS** in part the RP Motion as to Counterclaim Two for breach of contract as it relates to the alleged breach of Section 4.8 of the Operating Agreement for failure to provide material contracts to G1.34 for review.

### C. Counterclaim Three: Breach of Implied Duties of Good Faith and Fair Dealing Against RP

101. G1.34 asserts Counterclaim Three against RP, alleging that RP has breached its implied duty of good faith and fair dealing "in connection with the performance of the contracts at issue." (J.A. 280 at ¶¶ 84–85.)

102. RP contends it is entitled to summary judgment on Counterclaim Three because it is based on the same alleged conduct as Counterclaim Two for breach of contract and should rise or fall with that claim. (RP Mem. Supp. 14.)

103. G1.34 argues, however, that it may maintain an independent claim for breach of the implied duty of good faith and fair dealing because RP has "acted in an unexpected manner" under the Operating Agreement by attempting to prevent the Software from being commercialized, "thus frustrating the purpose of the contract for

G1.34 and denying G1.34 the reasonably expected fruits of its labor." (Mem. Opp'n RP Mot. 9.)

104. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985) (citation modified). "[W]here a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, [North Carolina courts] treat the former claim as 'part and parcel' of the latter." *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38–39 (2018) (citations omitted).

105. It appears from the record before the Court and the arguments of counsel that G1.34's claim against RP for breach of the implied covenant of good faith and fair dealing is premised on the same facts as its claim against RP for breach of contract. In fact, to the extent Counterclaim Three is based on G1.34's contention that Chapman, as the manager of RP, intentionally prevented the commercialization of the Software, that is the same argument G1.34 raised—which the Court has declined to consider, (*see supra* ¶ 90 n.10)—to support its position that it should still recover under its breach of contract claim despite the evidence showing that the $10,000.00 revenue condition precedent has not been satisfied. Thus, Counterclaim Three must rise and fall with Counterclaim Two.

106. The sole surviving issue under Counterclaim Two is whether Chapman's failure, as the manager of RP, to provide G1.34 with timely audited financial

statements for fiscal year 2023 constitutes a material breach of Section 4.7 of the Operating Agreement by RP. (*See supra* ¶ 97.) The Court concludes that the basis for Counterclaim Three—that Chapman, on behalf of RP, attempted to prevent the Software from being commercialized—is unrelated to the remaining question of whether RP breached Section 4.7 of the Operating Agreement. Rather, the basis for Counterclaim Three is "part and parcel" of those portions of Counterclaim Two which the Court concludes should be dismissed—specifically, the portion of Counterclaim Two alleging that RP breached the "Loan Agreement" by failing to pay amounts due thereunder upon the satisfaction of certain conditions precedent. Accordingly, the Court determines that Counterclaim Three must also be dismissed.

107. Therefore, the Court **GRANTS** in part the RP Motion as to Counterclaim Three for breach of the implied covenant of good faith and fair dealing.

### D.   Counterclaim Four: Unjust Enrichment Against RP

108. G1.34 brings Counterclaim Four for unjust enrichment against RP in the alternative to its Counterclaim Two against RP for breach of contract. Specifically, G1.34 alleges that (i) RP "holds money that in equity and good conscience belongs to [G1.34]"; (ii) RP obtained such money from G1.34 "in the form of the Loan, which Loan [RP] has now repudiated without justification"; and (iii) RP "would be enriched unjustly if permitted to retain the benefit of this wrongfully held money[.]" (J.A. 281 at ¶¶ 88–90.)

109. "In North Carolina, to recover on a claim of unjust enrichment, [the claimant] must prove: (1) that it conferred a benefit on another party; (2) that the

other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *PDF Elec. & Supply Co. v. Jacobsen*, 2020 NCBC LEXIS 103, at \*29 (N.C. Super. Ct. Sep. 9, 2020) (citing *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002)).

110. "A claim for unjust enrichment is 'neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law.'" *Id.* at \*28 (quoting *Booe v. Shadrick*, 322 N.C. 567, 570 (1988)). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Krawiec v. Manly*, 370 N.C. 602, 615 (2018) (citation modified). "If there is a contract between the parties the contract governs the claim and the law will not imply a contract." *Booe*, 322 N.C. at 570 (citation omitted).

111. As the Court has concluded that the Operating Agreement is a valid agreement and governs the repayment of the financial contributions made by G1.34, (*see supra* ¶¶ 88–89), Counterclaim Four for unjust enrichment fails as a matter of law. *See id.*

112. Therefore, the Court **GRANTS** in part the RP Motion as to Counterclaim Four for unjust enrichment.

### E.   Counterclaim Five: Breach of Contract Against AP

113. G1.34 brings Counterclaim Five for breach of contract against AP, alleging that AP has materially breached its express and implied contractual obligations

under the Operating Agreement "by failing to transfer an additional 9% membership interest in [RP] to [G1.34] for [G1.34's] successful delivery of the Software as a 'minim[um] viable product.'" (J.A. 282 at ¶ 95.)

114. AP contends it is entitled to summary judgment on Counterclaim Five because "G1.34 failed to produce substantial evidence that all conditions precedent were met to oblige AP to transfer nine percent of its membership units to G1.34." (AP Mem. Supp. 11–12.)

115. Pursuant to Section 11.2 of the Operating Agreement, AP is required to transfer nine percent (9%) of its membership interest to G1.34 "once (i) G1.34 has developed a Minimum Viable Product from the Software . . . and (ii) [RP] generates revenue of at least $10,000.00 from clients that have contracted to purchase and/or subscribe for such product." (J.A. 113 at § 11.2.)

116. As set forth herein, (*supra* ¶¶ 89–90), no genuine issue of material fact exists as to whether RP obtained $10,000.00 in client revenue. Thus, it is clear from the record before the Court that G1.34 is not presently entitled to the additional nine percent (9%) equity pursuant to Section 11.2 of the Operating Agreement as at least one of the conditions precedent to AP's obligation to make such transfer has not been satisfied.

117. Therefore, the Court **GRANTS** in part the AP Motion as to Counterclaim Five for breach of Section 11.2 of the Operating Agreement.

**F.** **Counterclaim Six: Breach of Implied Duties of Good Faith and Fair Dealing Against AP**

118. G1.34 asserts Counterclaim Six against AP, alleging that AP has breached its implied duty of good faith and fair dealing "in connection with the performance of the contracts at issue." (J.A. 282–83 at ¶¶ 99–100.)

119. As with Counterclaim Three, Counterclaim Six for breach of the implied covenant of good faith and fair dealing is "part and parcel" of Counterclaim Five against AP for breach of contract, which the Court has concluded must be dismissed, (*see supra* ¶ 117).

120. Therefore, the Court **GRANTS** in part the AP Motion as to Counterclaim Six for breach of the implied covenant of good faith and fair dealing.

**G.** **Counterclaim Seven: Unjust Enrichment Against AP**

121. G1.34 brings Counterclaim Seven for unjust enrichment against AP in the alternative to its Counterclaim Five against AP for breach of contract. Specifically, G1.34 alleges that (i) AP "holds membership interests in [RP] that in equity and good conscience belong to [G1.34]"; (ii) AP "has pretextually retained these membership interests, and [AP's] holding of these membership interests is unlawful"; and (iii) AP "would be enriched unjustly if permitted to retain the benefit of th[e] wrongfully held membership interests because, among other things, [G1.34] has fulfilled its obligations to deliver the Software as a 'minim[um] viable product[.]'" (J.A. 283 at ¶¶ 103–05.)

122. AP's obligation to transfer an additional nine percent (9%) equity to G1.34 upon the satisfaction of certain conditions precedent is governed by Section 11.2 of

the Operating Agreement. (J.A. 113 at § 11.2.) As a valid and enforceable contract governs, G1.34 cannot maintain this claim for unjust enrichment. *See Booe,* 322 N.C. at 570.

123. Therefore, the Court **GRANTS** in part the AP Motion as to Counterclaim Seven for unjust enrichment.

### H. Counterclaim Nine: Declaratory Judgment

124. G1.34 brings Counterclaim Nine for declaratory judgment against both AP and RP, seeking judicial declarations providing that (i) RP breached the Operating Agreement and "Loan Agreement"; (ii) no valid Buy-Sell Event occurred under the Operating Agreement and, therefore, G1.34 is under no obligation to sell its membership interest in RP; (iii) AP and RP have an obligation to repay the "Loan"; and (iv) the Software is a minimum viable product according to the definition of MVP in the Operating Agreement and, therefore, AP must transfer an additional nine percent (9%) membership interest in RP to G1.34. (J.A. 284–85 at ¶ 112.)

125. RP seeks partial summary judgment on Counterclaim Nine as to the requests for declarations that it breached a "Loan Agreement" and has an obligation to repay the "Loan." (RP Mot. 3.) AP seeks summary judgment as to Counterclaim Nine in its entirety.

126. With respect to the request for a declaration that RP breached the Operating Agreement and "Loan Agreement," the Court has determined herein that the sole surviving issue for trial is whether RP materially breached the Operating Agreement by virtue of Chapman's failure to provide timely audited financials for

fiscal year 2023. (*See supra* ¶ 97.) Accordingly, the Court **GRANTS** in part the Motions as to Counterclaim Nine's request for a Court declaration that RP breached the Operating Agreement and purported "Loan Agreement," except to the extent Counterclaim Nine seeks a limited declaration that RP breached Section 4.7 of the Operating Agreement related to the 2023 audited financials. To that limited extent, the Court **DENIES** in part the Motions as to Counterclaim Nine.

127. As to Counterclaim Nine's request for a declaration that no valid Buy-Sell Event occurred under the Operating Agreement and, thus, G1.34 is under no obligation to sell its membership interest in RP, the Court has concluded herein that a genuine issue remains for trial as to whether G1.34 materially breached the Operating Agreement, thereby triggering a valid Buy-Sell Event under Article 9. (*See infra* ¶¶ 137–38.) Accordingly, the Court **DENIES** in part the AP Motion as to Counterclaim Nine's request for such a declaration.

128. To the extent Counterclaim Nine seeks a declaration that AP and RP are obligated to repay the "Loan," the Court has concluded herein that G1.34 is not presently entitled to repayment of its financial contributions under Section 11.3 of the Operating Agreement because certain conditions precedent have not been satisfied. (*See supra* ¶ 91.) As such, the Court **GRANTS** in part the Motions with respect to Counterclaim Nine's request for a declaration that AP and RP are obligated to repay the "Loan."

129. Further, with respect to the request for a declaration that the Software has reached MVP and, thus, AP must transfer an additional nine percent (9%)

membership interest in RP to G1.34, the Court has concluded herein that G1.34 is not presently entitled to the additional equity as certain conditions precedent have not been satisfied. (*See supra* ¶ 116.) Therefore, the Court **GRANTS** in part the AP Motion as to Counterclaim Nine with respect to the request for such a declaration.

## I. Counts One and Four: Breach of Contract (Specific Performance) and Declaratory Judgment

130. AP and RP bring Count One against G1.34 for breach of the Operating Agreement, alleging that G1.34 materially breached the Operating Agreement "by failing to remit payments to RP for invoices received by RP for software as required by Section 11.1[.]" (J.A. 8 at ¶ 56.) AP and RP also allege that G1.34 has continued to refuse to close on the sale of its membership interest pursuant to the Buy-Sell process outlined in Article 9 of the Operating Agreement and, therefore, seek a Court order "requiring specific performance by G1.34 to close on the membership purchase required by the [Operating] Agreement." (J.A. 8–9 at ¶¶ 58–69.)

131. Relatedly, AP and RP bring Count Four for declaratory judgment, seeking judicial declarations that (i) G1.34 materially breached the Operating Agreement; (ii) RP and AP have fulfilled all conditions necessary for AP to exercise its option to purchase G1.34's membership interest in RP; (iii) G1.34 must sell its membership interest consistent with the terms and conditions provided by Article 9 of the Operating Agreement; and (iv) G1.34 must accept a promissory note from AP consistent with Article 9 of the Operating Agreement and the valuation of Economics Partners. (J.A. 11 at ¶ 86.)

132. The remedy of specific performance is available to "compel a party to do precisely what he ought to have done without being coerced by the court." *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694 (1981) (citation omitted). "The party claiming the right to specific performance must show the existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform." *Id.* (citation omitted).

133. AP alone seeks affirmative summary judgment on Count One and Count Four, arguing it has produced uncontested evidence that (i) the Operating Agreement is a valid agreement, (ii) AP is entitled to close on the sale of G1.34's membership units, and (iii) G1.34 has refused to close on the sale of its membership units. (AP Mem. Supp. 23–26.)

134. G1.34 argues AP has not satisfied the heightened burden justifying a grant of affirmative summary judgment on its breach of contract claim because "substantial evidence supports G1.34's contention that no legitimate Buy-Sell events occurred under the [Operating Agreement]." (Mem. Opp'n AP Mot. 28.)

135. With respect to the noticed Buy-Sell Event premised on G1.34's failure to pay certain Microsoft, EVOX, and SendGrid invoices, G1.34 contends that the record includes substantial evidence showing that those invoices were for operating expenses as opposed to software development costs and, therefore, not required to be paid by G1.34 pursuant to the Operating Agreement. (Mem. Opp'n AP Mot. 14.) Thus, G1.34 asserts "a genuine issue of fact exists as to whether G1.34's unwillingness to continue to pay for the [invoices], after repeatedly requesting

reimbursement from RP for the same, constituted a valid Buy-Sell event." (Mem. Opp'n AP Mot. 15.)

136. As to the noticed Buy-Sell Event based on G1.34's refusal to pay for items contained in SOW 3, G1.34 argues "[s]ubstantial evidence in the record shows that these items were out of scope and duplicative . . . and that Chapman signed SOW 3 over G1.34's vigorous objections." (Mem. Opp'n AP Mot. 16.) G1.34 maintains that the SOW 3 "was *not* for any work defined in the Minimum Viable Product criteria for the Software set forth in Exhibit A of the Operating Agreement[.]" (*See* J.A. 351 at ¶ 37.)

137. Upon review of the record, the Court determines that a genuine issue of material fact exists as to whether G1.34's failure to pay the Microsoft, EVOX, SendGrid, and SOW 3 invoices constitutes a material breach of the Operating Agreement sufficient to trigger a valid Buy-Sell Event under Article 9. AP has not satisfied its heightened burden of showing that it is entitled to affirmative summary judgment on Count One and Count Four, especially in light of the fact that G1.34 has offered evidence tending to show that Dr. Medendorp consistently objected to G1.34's payment of such invoices as outside the scope of what is required by the Operating Agreement and demanded reimbursement. (*See, e.g.*, J.A. 350 at ¶ 33; J.A. 755–58 at 191:16–194:5; J.A. 958–962 (reflecting disagreements between Chapman and Dr. Medendorp on in-scope items for SOW 3); J.A. 1399–400; J.A. 1402; J.A. 1439–40; J.A. 1455–56; J.A. 1527–29; J.A. 1531; J.A. 1534; J.A. 1541.)

138. Therefore, the Court **DENIES** in part the AP Motion as to Count One and Count Four.

## J.     Counts Two and Three: Indemnification

139. AP brings Count Two against G1.34 for indemnification, pursuant to Section 4.6 of the Operating Agreement, for losses, including costs and reasonable attorneys' fees, "caused by [G1.34's] breach of [its] obligation to close on the purchase of its membership interest[.]" (J.A. 9–10 at ¶¶ 74–76.)

140. RP brings Count Three against G1.34 for indemnification, pursuant to Sections 4.6 and 11.1 of the Operating Agreement, for losses, liabilities, damages, costs, or expenses for "G1.34's breach of its representation or warranty to remit payments to [RP] for payment of invoices received by RP for the Software, as well as its breach of its contractual obligation to close on the purchase of its membership interest[.]" (J.A. 10–11 at ¶¶ 79–82.)

141. AP and RP seek affirmative summary judgment as to Count Two and Count Three, in part, with respect to the issue of liability. (RP Mot. 3; AP Mot. 1.)

142. However, as the Court has determined that a genuine issue of material fact remains for trial as to whether G1.34 has materially breached the Operating Agreement, (*see supra* ¶ 137), it would be improper to grant summary judgment as to the issue of liability for indemnification premised on such alleged breaches.

143. Therefore, the Court **DENIES** in part the Motions as to Count Two and Count Three.

## VI. CONCLUSION

144. For the foregoing reasons, the Court hereby **GRANTS** in part and **DENIES** in part the Motions as follows:

   a. The Court **GRANTS** in part the AP Motion as to Counterclaim One for breach of fiduciary duty.

   b. The Court **GRANTS** in part the RP Motion as to Counterclaim Two for breach of contract as it relates to the purported "Loan Agreement."

   c. The Court **DENIES** in part the RP Motion as to Counterclaim Two for breach of the Operating Agreement to the limited extent that claim is based on an alleged breach by RP of Section 4.7 of the Operating Agreement for failing to provide G1.34 with timely audited financial statements for fiscal year 2023. However, the Court **GRANTS** in part the RP Motion as it relates to the allegations in Counterclaim Two of other breaches of Sections 4.7 and 4.8 of the Operating Agreement.

   d. The Court **GRANTS** in part the RP Motion as to Counterclaim Three for breach of the implied covenant of good faith and fair dealing.

   e. The Court **GRANTS** in part the RP Motion as to Counterclaim Four for unjust enrichment.

   f. The Court **GRANTS** in part the AP Motion as to Counterclaim Five for breach of Section 11.2 of the Operating Agreement.

g.     The Court **GRANTS** in part the AP Motion as to Counterclaim Six for breach of the implied covenant of good faith and fair dealing.

h.     The Court **GRANTS** in part the AP Motion as to Counterclaim Seven for unjust enrichment.

i.     The Court **GRANTS** in part the Motions as to Counterclaim Nine with respect to the request for a declaration that RP breached the Operating Agreement and purported "Loan Agreement," except to the extent G1.34 seeks a limited declaration that RP breached Section 4.7 of the Operating Agreement related to the 2023 audited financials. To that limited extent, the Court **DENIES** in part the Motions as to Counterclaim Nine.

j.     The Court **DENIES** in part the AP Motion as to Counterclaim Nine's request for a declaration that no valid Buy-Sell Event occurred and, therefore, G1.34 is under no obligation to sell its membership interest in RP.

k.     The Court **GRANTS** in part the Motions with respect to Counterclaim Nine's request for a declaration that AP and RP are obligated to repay the "Loan."

l.     The Court **GRANTS** in part the AP Motion as to Counterclaim Nine with respect to the request for a declaration that the Software has reached MVP and, thus, AP must transfer an additional nine percent (9%) membership interest in RP to G1.34.

m.     The Court **DENIES** in part the AP Motion as to Count One for breach of contract and specific performance.

n.     The Court **DENIES** in part the Motions as to Count Two and Count Three for indemnification.

o.     The Court **DENIES** in part the AP Motion as to Count Four for declaratory judgment.

145.   For the avoidance of doubt, the following claims will proceed to trial in this matter:

a.     G1.34's Counterclaim Two for breach of contract to the limited extent that claim is based on an alleged breach by RP of Section 4.7 of the Operating Agreement for failure to provide G1.34 with timely audited financials for fiscal year 2023.

b.     G1.34's Counterclaim Nine to the extent G1.34 seeks a judicial declaration that (i) RP breached Section 4.7 of the Operating Agreement related to the 2023 audited financials; and (ii) no valid Buy-Sell Event occurred and, therefore, G1.34 is under no obligation to sell its membership interest in RP.

c.     AP and RP's Count One for breach of contract and specific performance.

d.     AP's Count Two for indemnification.

e.     RP's Count Three for indemnification.

f.     AP and RP's Count Four for declaratory judgment.

**SO ORDERED**, this the 23rd day of April, 2026.

/s/ Michael L. Robinson
Michael L. Robinson
Chief Business Court Judge